FILED

FEB 1 4 2003

█████████████████████

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HASSAN ABBEY & YUSSUR ABRAR,<br>1164 Silver Beech Road<br>Herndon, Virginia 20170 | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. _____ |
| MODERN AFRICA ONE, LLC, a Delaware limited<br>liability company,<br>1100 Connecticut Ave., N.W.<br>Washington, D.C. 20006 | )<br>)<br>) | |

CASE NUMBER  1:03CV00259

JUDGE: Ellen Segal Huvelle

DECK TYPE: General Civil

DATE STAMP: 02/██/2003
                    14

JURY ACTION

Service on registered agent:
    Corporation Trust Company
    Corporation Trust Center
    1209 Orange Street
    Wilmington, Delaware 19801

STEPHEN CASHIN
3120 Woodley Road, N.W.
Washington, D.C. 20008,

and

NILES HELMBOLDT
Low Farthing Bank
Dumfriesshire, DG348H
Scotland, United Kingdom

Defendants.

For their Complaint against Defendants, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.    This is a civil action arising out of a breach of a fiduciary duty owed to the minority shareholders

of Warsun International Communications Corporation ("Warsun" or the "Company"), the conversion of

Plaintiff's assets, tortuous interference with prospective business opportunities and conspiracy by

defendant Modern Africa One, LLC ("Modern Africa") and certain of the directors of the Company,

1

including Stephen Cashin and Niles Helmboldt. This action is brought under the common law of the District of Columbia and the State of New York.

2.      This action is a direct claim brought by Plaintiffs, minority shareholders of Warsun, against Defendant Modern Africa in its capacity as majority shareholder of Warsun, and Stephen Cashin and Niles Helmboldt, members of Warsun's Board of Directors who acted in concert with and otherwise directed the actions of Defendant Modern Africa.

### THE PARTIES TO THIS ACTION

3.      Plaintiff Hassan Abbey ("Mr. Abbey") and Plaintiff Yussur Abrar ("Mrs. Abrar") founded Warsun as a New York corporation in September of 1994, and have been, from that date until present, shareholders of Warsun. Mr. Abbey and Mrs. Abrar are husband and wife.

4.      Plaintiffs were minority shareholders of Warsun at all times relevant to this complaint. Yussur Abrar served as President and Chief Executive Officer of Warsun, and Hassan Abbey as Senior Vice President.

5.      Plaintiffs were, at all times relevant to this complaint, and currently are residents of the Commonwealth of Virginia.

6.      Plaintiffs both served as directors of Warsun Network Solutions, Ltd., a Nigerian company ("Warsun Nigeria") owned jointly by Warsun, Plaintiff Yussur Abrar and Warsun Nigeria's manager, Chidi Ibisi.

7.      Defendant Modern Africa is a Delaware limited liability company, with its principal place of business located in the District of Columbia. It was established in 1997 for the purpose of making equity investments in Sub-Saharan Africa, particularly in manufacturing and communications enterprises, as an investment fund sponsored by the U.S. Overseas Private Investment Corporation, an agency of the United States government ("OPIC"), and private sector equity investors.

2

8.     At all times relevant to this Complaint, Defendant Modern Africa was the beneficial owner of a controlling and majority interest in Warsun. It acquired this interest pursuant to a Credit Agreement, dated as of August 20, 1999, by and between Modern Africa and Warsun, and a Warrant Agreement to Purchase Common Stock entered into in connection with such Credit Agreement.

9.     Defendant Stephen Cashin, a resident of the District of Columbia, has served as a member of the board of directors (the "Board") of Warsun and as a managing director of Modern Africa at all times relevant to this complaint.

10.     Defendant Niles Helmboldt, a resident of Scotland, has served as a Chairman of Warsun's Board and as Chairman of Modern Africa at all times relevant to this complaint.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 based upon the amount in controversy and the diverse citizenship of the parties to this proceeding.

12.     Venue is properly laid in this district because substantially all of the fiduciary breaches and tortuous conduct for which relief is sought occurred in this district, and the Defendants maintain their principal offices and conduct business in the district.

## PRESENTATION OF FACTS RELEVANT TO THE COMPLAINT

13.     Prior to 1999, Warsun engaged primarily in the sale of prepaid calling cards to immigrant communities within the United States. The Company entered into arrangements with carriers to carry and terminate calls made on their calling card platform, entered into service agreements and capacity leases with carriers, and invested in and provisioned software systems and equipment to track and monitor customer calls.

14.     Based upon Plaintiffs' prior experiences as executives for the United Nations and Citibank and their vision for developing a facilities-based telecommunications business in Africa, Plaintiffs began to

develop substantive business relationships with carriers in the United States and Africa, some of which had the potential to develop into very lucrative arrangements for Warsun.

15.     For example, Plaintiffs had secured the opportunity for Warsun to enter into an arrangement with Morocco Post, Telephone & Telegraphs ("Moroc Telecom"), whereby Warsun would interconnect its equipment with Moroc Telecom's network to deliver and receive voice, data and Internet signals.

16.     Capital investments in excess of funds that Plaintiffs had available to them were required in order to pursue such arrangements. Thus, Plaintiffs set out to raise funds beyond the nearly $1,000,000 of their own funds and income they had invested in Warsun.

17.     In addition, such arrangements with monopoly and other large carriers, to be fully utilized, required established interconnections with large international carriers. Such interconnections would enable Warsun to deliver and receive voice, data and Internet traffic coming to and from its monopoly and large carriers in large volumes.

18.     Based upon their desire to fulfill their vision to develop and grow a facilities-based telecommunications provider in Africa, Plaintiffs accepted a commitment by Modern Africa to invest $6 million in the Company in August 1999.

***Modern Africa's Controlling Interest in Warsun and the Duties that it Entailed***

19.     In exchange for its $6 million commitment, Modern Africa acquired, among other consideration, warrants for seventy percent (70%) of the outstanding capital shares of Warsun, along with a promissory note and security interest to secure its investment in the form of a loan.

20.     Defendant Modern Africa, based upon its conduct as described herein and the terms of its investment in Modern Africa, came to dominate and control Warsun following its initial investment in the Company.

21.     Defendant Modern Africa retained and exercised the right to appoint five out of the eight

directors who comprised Warsun's Board.

22.    Defendants routinely prepared *pro forma* financial statements for Warsun, particularly in connection with each draw down request it received from Warsun's management team.

23.    Based upon the controlling interest that Defendant Modern Africa acquired in Warsun, Modern Africa owed a fiduciary duty, as the Controlling Shareholder of Warsun, to Plaintiffs in their capacity as minority shareholders of Warsun.

24.    Defendant Modern Africa owed this duty to Plaintiffs without regard to the characterization of its interest in Warsun as debt or equity.  Plaintiffs acknowledge that Defendant Modern Africa was entitled to exercise rights as a creditor of Warsun, subject to its fiduciary duty as controlling shareholder.

25.    Plaintiffs contend that, based upon the facts as set forth herein, Modern Africa engaged in a deliberate, oppressive scheme to eliminate and convert Plaintiffs' entire interest in Warsun for its own benefit, and thereby breached the fiduciary duty that it owed to Plaintiffs.

26.    At all times relevant to this complaint, Plaintiffs each performed their respective duties as officers and directors of Warsun with the utmost of care, loyalty and good faith.

*Modern Africa Adversely Controlled Warsun's Access to Capital*

27.    Warsun received Modern Africa's initial $6 million investment in delayed tranches, and primarily used the funds to plan, develop and provision a telecommunications network consisting of equipment and satellite and fiber lease costs, to pay salaries and other overhead costs.

28.    Modern Africa was fully aware from the outset that, based upon the business plan that Modern Africa endorsed for Warsun and their mutual vision for the Company's progress, Warsun was in need of additional outside funding in order to meet its business and operating objectives.

29.    The initial credit agreement entered into by the parties specifically mentioned the need for the Company to raise operating funds from outside sources, as did the subsequent financing documents

entered into by Modern Africa and Warsun.

30.    Defendant Modern Africa, nonetheless, intentionally made itself the sole source of outside financing for Warsun, intentionally prevented Warsun from obtaining the outside capital and failed to provide sufficient amounts of its own funds to Warsun necessary to fund their mutual vision for the Company, its operations and business plan.

31.    Plaintiffs engaged in a comprehensive search for additional capital, but were stifled by the Defendants' failure to act in good faith.

32.    Plaintiffs were unable to obtain even an operating line of credit for Warsun to fund current liabilities, as banks, due to Modern Africa's large debt interest in Warsun, refused to provide such a line of credit.

33.    Modern Africa, pursuant to each of its credit agreements with Warsun, maintained the right to convert, at any time, its entire debt interest in Warsun to equity.

34.    Plaintiffs repeatedly requested that Defendants convert all or a portion of Modern Africa's debt in Warsun to equity, provide assurances to prospective investors that it would convert its interest, or at least agree to guarantee a line of credit in order to facilitate outside financing for Modern Africa.

35.    The Defendants never took any of the requested steps despite explicitly endorsing Plaintiffs' search for outside capital, and despite learning from Plaintiffs that prospective investors had requested that such actions be taken.

36.    Throughout the time of its involvement with Warsun, despite blocking Warsun's access to outside funds and despite receiving repeated requests from Plaintiffs for funds, Modern Africa failed to fund Warsun with its own funds on a timely basis.

37.    Plaintiffs consistently encountered delays from Defendants following Plaintiffs' requests for draw downs from Modern Africa initial investment and a subsequent $4 million investment by Modern

6

Africa. Further, Defendants often provided less funding than requested by Plaintiffs.

38.     Due to Defendants' refusal to accommodate a line of credit for Warsun, such delays and shortfalls had a direct, adverse impact on Warsun's operations from time to time.

39.     From time to time, the telecommunications market in the United States suffered through calamities, such as the steep decline in the U.S. and other developed telecommunications markets beginning in 2001, and the events of September 11, 2001, which resulted in the destruction of a key component of Warsun's network in the United States.

40.     These events, as a result of Warsun's connections to multi-national carriers for whom it carried voice, data and Internet traffic to and from Africa, had a substantial adverse effect on Warsun's short-term financial performance.

41.     Despite repeated requests from Plaintiffs, Defendants failed to provide adequate capital to Warsun under these circumstances, or to allow Warsun to obtain such capital from outside investors.

42.     The adverse impact that Defendants' debt interest had on Warsun's balance sheet also adversely impacted Warsun's ability to transact businesses with the large international carriers, who comprised a significant segment of its target customer base.

43.     International carriers who evaluated Warsun's balance sheet, upon realizing that the Company was heavily leveraged (due exclusively to Modern Africa's interest), refused to transact business with Warsun either at all or in significant volumes for fear that Warsun was a poor credit risk. From their perspective, the $6 million that had been committed by Modern Africa as debt and subsequent $4 million constituted no liquidity or assurance of payment whatsoever.

44.     As a result of the foregoing issues relating to Warsun's financial situation, Warsun was unable to generate substantial revenues and income from its international operations, thereby enhancing its need for capital to fund its operations and business plan.

45.     A substantial portion of the funds advanced by Modern Africa were expended to cover salaries, telecommunications capacity lease costs and other ordinary and customary business expenses, all with the full knowledge and consent of Defendants.

46.     In early 2002, as Plaintiffs searched for additional capital for Warsun, Defendants orally committed to invest an additional $1 million in Warsun and, based on information and belief, obtained investment committee approval for the investment.

47.     The Defendants failed to provide the $1 million for several months, despite Warsun's need for the funds and the boost that it would have provided to Warsun's operations as it closed on and began implementation of a number of key customer relationships.

48.     Instead of advancing the funds, Defendants allegedly converted all or a substantial part of their debt interest in Warsun to equity, declared a default on the debts allegedly owed to Modern Africa by Warsun, and caused Warsun to file for voluntary bankruptcy.

49.     Immediately thereafter, Modern Africa supplied Warsun with the $1 million investment of funds.

50.     Based upon information and belief, Defendant Modern Africa encountered significant problems with its investment portfolio following 2001, which suffered a precipitous decline in value, and was severely constrained in its ability to fund a business plan such as the one it contemplated for Warsun.

51.     But for the Defendants failure to act in good faith during the course of its dealings with Warsun and the Plaintiffs, Warsun could have obtained funding from additional sources and significantly expanded its customer and revenue base.

52.     Modern Africa repeatedly acknowledged Warsun's financing requirements and the need for outside investors, but failed to take necessary steps to facilitate investments by third parties.

*Warsun Added a Substantial Component to Its Business by Establishing Warsun Nigeria*

53.     To complement the development of its network in the United States, Warsun's business plan

contemplated the development of Internet Protocol ("IP") "gateways" throughout Africa.

54.     Such gateways are comprised of state-of-the-art, relatively low-cost telecommunications equipment and software systems that would enable Warsun's African affiliates to deliver and receive significant amounts of voice, data and Internet traffic from local Internet Service Providers and telecommunications carriers.

55.     The gateways would connect to Warsun's international network and deliver and receive an increasing amount of telecommunications traffic to and from the network.

56.     In August 2000, Warsun established an entity in Nigeria, Warsun Network Solutions, Ltd., a Nigerian company ("Warsun Nigeria"), for the purpose of obtaining telecommunications licenses and establishing a facilities-based operation or gateway in Nigeria, the largest market in Africa.

57.     Warsun Nigeria completed the build-out of its gateway by September 2001, and subsequently developed a customer base of dozens of Nigerian Internet service providers and wireless and fixed-line telecommunications carriers. For less than $1 million, Warsun Nigeria had developed a telecommunications platform that several years prior, based on older technologies, would have cost multiples of that amount.

58.     Warsun Nigeria generated a positive cash flow shortly after commencing operations, and paid a substantial part of its earnings to Warsun.

59.     Warsun Nigeria's formation documents, including its Articles of Association, set forth the names of shareholders of Warsun Nigeria, which included Warsun and Plaintiff Yussur Abrar. Warsun owned 6 million shares of Warsun Nigeria, and Plaintiff Yussur Abrar owned 1 million shares.

60.     Modern Africa had full and constructive knowledge of the initial shareholdings of Warsun Nigeria.

61.     Warsun Nigeria's Articles of Association provided that the shareholders of Warsun Nigeria

maintained a right to purchase the shares of any other Warsun Nigeria shareholder who declared bankruptcy.

62.     Thus, when Defendants caused Warsun to file for bankruptcy protection in August 2002, Plaintiff Yussur Abrar immediately acquired the right to purchase all of Warsun's interest in Warsun Nigeria.

63.     Upon learning of Warsun's bankruptcy filing, Plaintiff Yussur Abrar immediately exercised her right to acquire Warsun's shares of Warsun Nigeria by delivering written notice to Warsun requesting that it establish a price for the shares, all as prescribed by the Articles of Association and Nigerian law.

64.     Prior to Plaintiffs' exercise of their rights to the shares of Warsun Nigeria owned by Warsun, Modern Africa and Warsun recognized Warsun Nigeria as a separate entity with a separate management team.

*Plaintiffs Developed Warsun into a Valuable Franchise Poised to Take Full Advantage of Tremendous Opportunities in the African Telecommunications Market*

65.     From the date of Modern Africa's initial investment in Warsun until August 2002, Warsun developed a valuable telecommunications franchise throughout the continent of Africa and here in the U.S. By August 2002, the Company was well known throughout the telecommunications market both in the United States and throughout Africa, and carriers sought relationships with the Company.

66.     Warsun contemplated constructing and operating telecommunications gateways in new markets in Africa, in addition to Nigeria, that would enable Warsun to expand its local customer base of Internet service providers and telecommunications carriers.

67.     The expansion of Warsun's gateway technology would have enabled it to provide additional value-added retail services throughout Africa, including prepaid calling card services, wire transfers and electronic payment services.

10

68.    A partial valuation of owner's equity, prepared by Ernst & Young in June 2001, valued Warsun at approximately $100 million on the assumption that it receive a $40 million investment.

69.    Defendants were well aware of the Company's value, having prepared pro forma financial statements for Warsun on a regular basis and having evaluated prospective business opportunities for Warsun that would return the Company to financial stability following the events of September 11, 2001.

70.    Warsun succeeded in closing on roughly 90% of the contracts cited by the Defendants, including an agreement with SierraTel, the largest and most significant of these transactions, as matters that would conservatively place Warsun in a positive cash flow position.

71.    As late as January 2002, prior to entering into the above-referenced transactions with SierraTel and other parties, but after the devastating events of September 11, 2001, Defendants acknowledged that a proper valuation for Warsun was at least $14 per share, or roughly $16.8 million total.

72.    As of August 2002, excluding Defendant Modern Africa's purported debt interest in Warsun, Warsun had no creditors other than trade creditors whose debts accrued in the ordinary course of business.

73.    But for Defendants' failure to deliver Modern Africa's contemplated $1 million investment or to facilitate a letter of credit for Warsun, Warsun would not have been delinquent or otherwise in default of its trade credit obligations.

74.    Warsun Nigeria, as alleged previously, developed a substantial client base in Nigeria, generated positive cash flow and made dividend or other payments to Warsun.

75.    Even following Warsun's voluntary bankruptcy filing in August 2002 and a precipitous decline in the Company's customer and revenue base, Modern Africa loaned an additional $1 million to Warsun and offered consideration for substantially all of Warsun's assets equal to $6.1 million. Defendant Modern Africa itself offered to and did purchase substantially all of Warsun's assets for consideration

11

equal to $6.1 million.

76.    Defendant Modern Africa's dogged determination to acquire Warsun's business and assets, as well as Warsun Nigeria and its assets, as described herein, provides an indication as to the value of the Warsun franchise in Africa as recognized by Defendants.

77.    Prior to the bankruptcy filing, Plaintiffs undertook several steps to increase the profitability of the Company, including acquiring a telecommunications switch in the U.S. to handle larger volume of traffic at a lower cost, and planning to shift a substantial part of the Company's operations to Africa at a savings of approximately $200,000 per month.

78.    At the time of the bankruptcy filing, profit margins from voice and data services throughout Africa remained substantially higher than in other markets.

79.    For certain technologies, such as wireless and IP telephony, Africa, unlike the U.S. and other developed markets, presents an abundant opportunity for small carriers and entrepreneurs.

80.    Warsun was perhaps better positioned than any other facilities-based international carrier to take advantage of tremendous opportunities available in the African telecommunications space.

*Modern Africa Used its Control and Dominance Over Warsun To Harm Plaintiffs and Their Work Force*

81.    Defendants actively participated in the day-to-day management of Warsun from the time of their initial investment in Warsun, actually exercised direct control over day-to-day operations beginning in January 2002, and were at all times sufficiently aware of and oversaw business decisions made by Plaintiffs in their capacity as officers of Warsun.

82.    Defendants failed to take steps from 1999 through 2002 to authorize the establishment of a stock option plan presented repeatedly by Plaintiffs to Defendants, and the issuance of shares to employees pursuant to such a plan, despite the fact that Plaintiffs indicated their willingness to set aside shares to

12

which they were entitled for this purpose.

83.     Until the Spring of 2001, Defendants required daily telephone reports from Plaintiff Yussur Abrar regarding any events that occurred and any decisions made or to be made by Plaintiffs in connection with their operation of the business.

84.     The Defendants continued to prepare *pro forma* financial statements for Warsun through 2002.

85.     Beginning in January 2002, Defendants met directly with officers and employees of the Company on a routine basis without the participation of Plaintiffs.

86.     The Defendants ignored suggestions made by Plaintiffs with regard to the Company's fundraising needs, proposed cost-cutting measures and other matters.

87.     The Defendants shunned and marginalized Plaintiffs and Warsun's African employees, who collectively maintained substantial influence and connections with respect to the African marketplace, and constituted Warsun's entire marketing and customer relations team.

88.     Employees noted to Plaintiffs that Defendants maintained an interest in meeting with only certain of the Company's employees, and that Defendants established a comfort level with the Company's non-African and non-African-American employees.

89.     Defendants supplanted Warsun's employees and management team and replaced them with consultants with little or no experience or connections in Africa.

90.     The Defendants' treatment of Warsun's managers and employees and its refusal to provide funding to Warsun on a timely basis damaged morale and created substantial ongoing operational problems for Warsun throughout 2002.

91.     Early in 2002, sensing tension between Defendants and Plaintiff's management team, Plaintiffs suggested the parties discuss, among several issues, possible severance for Plaintiffs in the event that Defendants desired to replace them, the appointment of disinterested directors, conversion of Modern

13

Africa's purported debt interests to equity, and a full accounting for Warsun's capital structure.

92.     Defendants ignored Plaintiffs' suggestions.

93.     In July 2002, Defendants developed and presented misleading *pro forma* financial statements to Warsun's Board that cast Warsun's future performance in an unjustifiably negative light.  The statements included debts that did not exist, and projected revenues below recent historical figures.

94.     Based in part upon such misleading financial statements, Defendant Modern Africa terminated substantial parts of Warsun's senior management team and marketing staff, along with the Company's minority and African employees (including the Plaintiffs).  Further, it constructively removed Plaintiffs as directors of the Company.  The dismissed employees constituted roughly one-half of Warsun's work force.

95.     As customers of Warsun realized that Warsun employees responsible for their accounts had become disenfranchised or otherwise terminated from their positions with the Company, they terminated their relationships or agreements with Warsun and otherwise significantly reduced their business dealings with the Company.  One of Warsun's recent carrier customers, whom Modern Africa relied upon to bring Warsun to a positive cash flow, immediately terminated its relationship with Warsun upon learning of its bankruptcy filing.

96.     Defendants granted no severance pay to Plaintiffs and the terminated employees, and refused to reimburse them their reasonable business expenses.

97.     From early 2002 until the bankruptcy filing, based upon information and belief, Plaintiffs are aware that Defendants commissioned individuals to continuously follow and physically intimidate Plaintiff Yussur.

98.     Plaintiff Yussur Abrar feared for her own safety and the safety of her family members.  Plaintiffs suffered emotional distress and anguish as a result of Defendant's actions.

14

***Defendants First Considered Unreasonable Options for Diluting Plaintiffs' Interest in Warsun to Accomplish Their Objective of Squeezing Out Plaintiffs***

99.     Defendants retained consultants in early 2002 ostensibly for the purpose of advising Defendants on a proper course of action for Warsun, and ultimately for the purpose of managing the company following Defendants' termination of Plaintiffs and their management team.

100.    Based upon information and belief, Defendants discussed compensation and other employment terms with the consultants, and considered the issuance of a substantial amount of equity (over 10%) to the consultants.

101.    For the next several months, Defendants took steps to terminate Plaintiffs as officers of the Company and to supplant them with the consultants.  As such, Defendants considered their ability to compensate a new management team through the use of equity and cash in connection with the replacement of Warsun's management team.

102.    Such options would be difficult to issue without the consent of Plaintiffs in their capacity as shareholders and managers of Warsun.

103.    Given that the Defendants had failed to implement a stock option plan on behalf of the management team selected by Plaintiffs, and given that the Defendants were prepared to issue an award to the consultants that equaled approximately one-half of Plaintiff's interest in the Company, Plaintiffs informed Defendants that the proposal was not reasonable or practicable at that time.

104.    Defendant Modern Africa, on each occasion when it provided funds to Warsun, sought a greater share of Warsun's outstanding equity interests.

105.    For example, in connection with its $6 million investment in Warsun it obtained warrants to acquire 700,000 shares of Warsun's capital stock at a per share price equal to $8.57; in connection with a subsequent $3 million investment in Warsun it obtained the right to convert its interest to shares

15

Warsun's capital stock at a per share price equal to $14.

106.    Following the second round of financing, Plaintiffs again raised concerns with Defendants in connection with Modern Africa's failure to adequately fund Warsun or to clean up Warsun's balance sheet in order to facilitate outside financing (including a line of credit) and stronger carrier relationships, its continued failure to implement a stock option for Warsun's employees, and other matters.

107.    In light of these concerns, Defendants informed Plaintiffs of their willingness to loan funds to Warsun on terms that did not include any equity component.

108.    Despite Defendants' representations, Plaintiffs received proposed documents in June and July 2002 relating to the transaction that contained terms adverse to the interest of Plaintiffs that had not been discussed prior to delivery of the draft, including the creation of a new class of preferred shares to be issued to Defendants upon conversion at a conversion rate of $14 per share, and a 16% interest rate, 6% higher than under prior credit agreements.

109.    The proposed loan transaction and pending management change would have unreasonably diluted Plaintiffs' interest in Warsun, notwithstanding Plaintiffs' substantial contribution to the development of the Company and the value of the Company at that time.

110.    Had Defendants acted in good faith to facilitate outside financing, any lender or investor would likely demand a priority interest that would be equally dilutive of Defendant Modern Africa and Plaintiffs alike.  Similarly, to the extent the parties sought new management, equity compensation plans would be dilutive to all shareholders and not just Plaintiffs, and would have been at levels more customary for early stage companies and more palatable for Plaintiffs.

111.    As alleged previously, Defendant Modern Africa apparently encountered significant problems with its investment portfolio following 2001, and was severely constrained in its ability to fund a business plan such as the one it contemplated for Warsun.

112. Rather than facilitate an investment opportunity for outside sources, Defendants acted in bad faith by forcing Warsun to operate on an unreasonably restrictive financing plan.

113. Defendant's financing plan for Warsun was implemented without regard for the value of the business opportunities available to Warsun in Africa and the substantial brand value that the Company had created.

114. Based upon information and belief, the Defendants made decisions regarding Warsun based in part upon the effect of the downturn in the telecommunications market in the United States and other developing economies.

115. The Defendants relied upon the advice of the consultants it supplied to Warsun, none of whom had prior experience doing business in Africa and none of whom had significant experience as financial advisors.

116. Consequently, the Defendants intentionally or recklessness, in the course of its conduct with respect to Warsun, failed to account for the substantial value inherent in the Company, notwithstanding its need for additional capital.

117. Defendants, based upon the course of their conduct, incorrectly presumed that a company does not maintain value for its shareholders simply because it requires additional funding.

118. Defendants, by failing to retain proper advisors in connection with Warsun's bankruptcy filing, along with independent directors' approval of the filing, and by failing to evaluate the merits of subrogating their interests for those of another financier, failed to act in a manner consistent with their fiduciary duty as controlling shareholders.

***The Process Leading to Warsun's Bankruptcy Filing and Thereafter Has Been Tainted by a Lack of Good Faith, Deception and Irregularity on the Part of Defendants***

119. The grounds upon which Defendants caused Warsun to file for Bankruptcy protection are shaky.

17

120.    At no time did Defendants present a plan to Plaintiffs, in their capacity as directors and minority shareholders, recommending the replacement of Plaintiffs as managers of Warsun, despite Plaintiff Yussur Abrar's suggestion to Defendants that they do so in lieu of causing Warsun to file for bankruptcy protection.

121.    As alleged previously, Defendants presented doctored *pro forma* statements to make their case to Plaintiffs in their capacity as directors.

122.    Substantial problems exist with Defendants' claims that Warsun defaulted on purported debt obligations due to Defendant Modern Africa.

123.    On July 26, 2002, Defendant Modern Africa apparently notified Warsun's bankers of a default on debts allegedly due to it by Warsun pursuant to Modern Africa's first investment in Warsun, and foreclosed on its bank accounts.

124.    No notice of default was ever provided to Plaintiff Yussur Abrar, who, as of July 26, 2002, served as a director and President and Chief Executive Officer of Warsun. She had no direct knowledge of the occurrence of any default or the declaration thereof.

125.    On August 9, 2002, Defendant Modern Africa apparently declared a default on debts allegedly due to it by Warsun under the second extension of credit. Plaintiffs, who served as directors of Warsun until their resignation was tendered on August 11, 2002, received no notice of the default.

126.    Defendants failed to appoint disinterested directors, as suggested by Plaintiffs, to oversee its decisions with respect to the declaration of defaults on debts held by Modern Africa and the bankruptcy filing.

127.    On either date, Warsun was not in default of any material debt obligations, including with respect to any debts owed to Defendant Modern Africa.

128.    Based upon the terms of each of Modern Africa's investments in Warsun and Warsun's capital

18

structure, such investments could properly be characterized as equity investments rather than debt interests in Warsun.

129. The investment documents contained no due date for principal under the purported loans.

130. The documents and course of conduct between the parties suggests that no expectation for periodic repayment of interest existed. The parties established no reserve funds for the purpose of repaying the purported debts due to Modern Africa.

131. No bank or similar financial institution would have extended credit or a loan to Warsun without a substantially greater sum of cash or liquid assets available as equity. Further, financial institutions customarily investing in early stage ventures such as Warsun acquire shares of a preferred class as consideration for their investment.

132. As such, Defendants were not entitled to exercise remedies as creditors of Warsun, and instead clearly owed duties as equity holders.

133. Further, based upon the terms of the credit agreements and the parties' subsequent course of conduct, Defendants' declaration of default constituted a failure to act in good faith, and a breach of Defendant Modern Africa's contractual obligations to Warsun. Defendants may not in good faith advance the argument that Warsun was in breach of a covenant set forth in the agreements.

134. Interest payments did not come due under the credit agreements until November of each year.

135. Both agreements provided Warsun with a ten-day period cure from the date of notice of a default. As alleged previously herein, no proper notice of either default was provided to the Company or its disinterested directors.

136. Defendants, on August 9, 2002, also converted their entire debt interest pursuant to the second credit agreement, which provides that all such debt would be extinguished upon conversion.

137. A sworn statement filed by the new Chief Executive of Warsun contained in the bankruptcy

19

petition filed by Warsun indicates that Defendant also converted its debt interest pursuant to the initial credit agreement, which also provides that all such debt would be extinguished upon conversion.

138.    Further, under both credit agreements, any conversion of debt to equity was to be applied first as repayment of Warsun's interest and current obligations due under the agreements.

139.    Defendants were not entitled to simultaneously declare a default of the obligations and to convert the obligations to equity.

140.    A creditor who exercises control over a debtor owes a duty of good faith to the debtor.

141.    In the event that Warsun's debts with trade creditors may be regarded as having triggered a default under either of the credit agreements, to the extent that Defendants had conducted themselves in good faith, such defaults would not have occurred.  Further, it is questionable whether any such debts could be regarded as material under the circumstances.

142.    On August 13, 2002, Defendant Modern Africa caused Warsun to file a voluntary bankruptcy petition (the "Bankruptcy Petition") for relief under Chapter 11 of the United States Bankruptcy Code with the Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

143.    The Bankruptcy Petition and other documents filed with the Bankruptcy Court at the direction of the Defendants contained several egregious inconsistencies and misstatements, including misleading information regarding Defendant Modern Africa's debt and equity interests in Warsun and regarding their ownership interest in select assets of Warsun and Warsun Nigeria.

144.    For example, Defendants indicated that Warsun's telecommunications switch located in Reston, Virginia has been sold by Warsun on May 10, 2002, when it had actually never been sold and Defendant Modern Africa intended to maintain control over the switch.

145.    The switch was never made available throughout the bankruptcy process, thereby ensuring that prospective bidders had little opportunity to acquire the asset.

146.    As alleged previously, Defendants caused Warsun to represent that it had converted its entire debt interest to equity while still maintaining the full amount of its secured investment in the Company.

147.    Defendants failed to obtain proper financial advice and the approval of disinterested directors in connection with the bankruptcy filing.

**Following the Bankruptcy Filing, Additional Evidence Emerged that Defendants Engaged in a Deliberate Scheme to Squeeze out Plaintiffs as Minority Shareholder of Warsun**

148.    Defendants planned to control and operate the business of Warsun for their own benefit following the bankruptcy filing and termination of the bankruptcy process.   The only plan for the Company presented to the Bankruptcy Court by Warsun, operating under the control of Defendants, involved the sale of substantially all of the assets of Warsun to Defendant Modern Africa.

149.    Defendant Modern Africa, following the bankruptcy filing, maintained a continuing priority interest in Warsun as a purported creditor.  To the extent it could acquire Warsun's assets, it was aware that it could continue the business without any participation by or interest held by Plaintiffs.

150.    Defendant Modern Africa was aware that, based upon conditions in the U.S. telecommunications market, Warsun's assets could be purchased through the bankruptcy process at a substantial discount from historic cost.   Further, given that Defendant Modern Africa represented to the Court that it maintained a $6 million secured debt interest in the Company, any potential purchaser would essentially require Defendants' consent.

151.    Defendant Modern Africa actually acquired substantially all of the assets to which Warsun held marketable title as of December 31, 2002.

152.    The bankruptcy filing, the alienation and termination by the Defendants of a substantial component of the Company's workforce, and the unreasonable manner in which Defendants prevented Warsun from obtaining additional funds on an ongoing basis collectively caused substantial harm to

Warsun's business, resulted in a complete loss of the value of Plaintiff's shares in Warsun, and caused Plaintiffs severe emotional distress, trauma and anguish.

153.    Once Defendants realized that Warsun's interest in Warsun Nigeria was subject to Plaintiffs right to acquire Warsun Nigeria shares owned by a bankrupt shareholder, Defendants, consistent with their deliberate efforts to oppress and squeeze out Plaintiffs as minority shareholders of Warsun, subsequently engaged in a multi-faceted effort to disgorge Plaintiffs of their entire interest in Warsun Nigeria.

154.    In so doing, Defendants demonstrated an intentional and reckless disregard for the rights and interests of Plaintiffs and for the laws of a foreign jurisdiction.

155.    Defendants delivered written notices to Warsun Nigeria's customers directing that payments due to Warsun Nigeria instead be directed to Warsun, resulting in a substantial loss of revenue for Warsun Nigeria.

156.    Defendants presented forged documents to Warsun Nigeria's bank in an effort to change the signatories to and authorized representatives on Warsun Nigeria's depository account.

157.    Based upon information and belief, Defendants solicited the customers of Warsun Nigeria, disparaged Warsun Nigeria's management, offered the business of Warsun Nigeria for sale to third parties and, in conspiracy with entities and individuals acting under their control, engaged in efforts to compete directly against the business of Warsun Nigeria.

158.    Defendants effort has also included repeated illegal efforts to take physical possession of Warsun Nigeria's facilities and assets.

159.    On three consecutive days in September 2002 (September 9, 10 and 11), agents and representatives of the Defendants arrived at Warsun Nigeria's premises, accompanied by thugs armed with automatic guns, crow bars, sledgehammers and torches for the clear purpose of seizing the premises and/or assets of Warsun Nigeria.

160.     Plaintiffs, fearful for their lives, provided notice to Defendants of these activities on September 9 to no avail, and soon thereafter secured a court order restraining Warsun, under the exclusive control of Defendant Modern Africa, from interfering with and damaging Warsun Nigeria's business and facilities.

161.     Plaintiffs suffered emotional distress and mental anguish as a result of Defendants' intimidation tactics and misconduct in Nigeria.

162.     Plaintiff Hassan Abbey was present at Warsun Nigeria's premises during each of the three violent raids, and hid in a locked office for safety.  Plaintiff Yussur Abrar received prescribed medication in connection with her distress.

163.     On each occasion, Defendants' representatives were informed by Nigerian police of the illegality of their actions, and warned that their behavior, if continued, would likely spark violence and further physical confrontation.

164.     Defendants had no justification, provocation or probable cause for attempting to seize Warsun Nigeria's facilities, nor for doing so in an intimidating, threatening and violent manner.

165.     Defendants subsequently caused Warsun to protest Plaintiff's acquisition of its shares in Warsun Nigeria and to dispute Warsun Nigeria's right to its assets in Nigeria before the courts in Nigeria.  The dispute is ongoing.

166.     Defendants attached a list of substantially all of Warsun Nigeria's assets to a schedule submitted to the U.S. Bankruptcy Court, and improperly represented that such were held directly by Warsun and could thus be acquired by Defendant Modern Africa.

167.     Defendants also represented to the U.S. Bankruptcy Court that all of the shares of Warsun Nigeria and Nigerian telecommunications licenses held by Warsun Nigeria were assets of Warsun that would be acquired by Defendant Modern Africa, despite legal restrictions prohibiting the transfer of these assets.

168.    Warsun Nigeria's assets belonged properly to Warsun Nigeria, which was not the subject of any bankruptcy proceedings, and not to Warsun. Warsun maintained only an interest in shares of Warsun Nigeria, which shares were subject to Plaintiffs' right of acquisition.

169.    Irrespective of Plaintiffs' established legal rights, and in addition to Defendants' efforts to acquire Warsun's business free and clear of Plaintiffs' participation and ownership, Defendants also intended to acquire the business and assets of Warsun Nigeria for their own benefit free and clear of Plaintiffs' participation and ownership.

170.    Defendant's actions have had the effect of destroying Warsun Nigeria's entire customer and revenue base, and caused Plaintiffs severe emotional distress, trauma and anguish.

171.    Warsun Nigeria presented a tremendous opportunity for Plaintiffs to build on Warsun Nigeria's early efforts, as well as a platform from which to continue their pursuit of a pan-African telecommunications enterprise apart from Warsun.

***Defendants Engaged in Continued, Egregious Criminal Conduct in their Efforts to Ensure that Modern Africa Inherited the Business and Assets of Warsun Nigeria***

172.    On or around January 27, 2003, the Nigerian police summoned Warsun Nigeria's manager to police headquarters for questioning.

173.    Based upon information and belief, the Defendants solicited the participation of the Nigerian police in this matter so that Defendants could gain access to and control over Warsun Nigeria's premises and assets.

174.    Chidi Ibisi, Warsun Nigeria's manager, and his attorney described to the police the nature of the ongoing dispute before the Nigerian courts.

175.    The next day, Warsun Nigeria's manager and his attorney were again summoned, at the direction of Defendants, to appear before the police.

24

176.   Based upon information provided to the police regarding the court action, the police informed representatives of the Defendant that the police could be of no further assistance, and that their efforts to solicit and engage police participation in the matter were illegal.

177.   In response to the continued threat posed by Defendants to Warsun Nigeria, police officers began to guard Warsun Nigeria's premises on a round-the-clock basis.

178.   On January 30, 2003, just two days after having receiving the warning from the Nigerian police regarding their conduct, the representatives and agents of Defendants, along with the armed thugs, again stormed Warsun Nigeria's premises. They were rebuffed once again by the arrival of the police, who subsequently issued warrants for the arrest of Defendants' representatives.

179.   Based upon information and belief, the Defendants had solicited the support of the Nigerian police in connection with their continued raids on Warsun Nigeria.

180.   On January 31, 2003, several hours after customary business hours, the Defendants' representatives against stormed Warsun Nigeria's premises, this time gaining access. The thugs accompanying Modern Africa's agents, high on marijuana and armed with machetes, sledgehammers, automatic guns and other weapons, beat the police guards, seized mobile phones, threatened Warsun Nigeria's employees and held them against their will.

181.   Representatives of the Defendants intended to and did inflict physical harm on several individuals during the course of their illegal raid on Warsun's premises.

182.   In addition to the beating inflicted on several individuals present at Warsun Nigeria's premises, an employee of Warsun Nigeria who managed to escape confinement was slashed in the leg by a machete.

183.   Defendants' representatives were jailed for their conduct, posted bail and immediately fled Nigeria in violation of their bail terms. Their lawyer, who accompanied them on the raids, was also

25

jailed, and remained in jail for some time following his client's flight from the law as a result of their failure to comply with the terms of their bond.

184.    Defendants, through these agents and representatives, have engaged in a repeated pattern of misconduct and criminal activities that involved physical intimidation, trespassing, assault and battery, assault and battery of police officers, assault with the intent to maim or kill, false imprisonment and other prosecutable offenses.

185.    The Defendants were fully aware of, orchestrated and commissioned the activities of their agents and representatives with respect to their repeated illegal conduct.

186.    Based upon information and belief, Defendants' agents and representatives have attempted to suppress the production of a police report describing the nature of their actions and offenses, and have engaged in efforts to suppress legal proceedings that may be pursued against them in Nigeria.

187.    Based upon information and belief, Defendant Niles Helmboldt was present in late January when Defendant Modern Africa's representatives engaged in repeated criminal offenses.

***Summary of Defendants' Misconduct***

188.    Defendant Modern Africa's intentional and deceitful conduct prior to and in connection with the bankruptcy filing and the aforementioned purchase of Warsun's assets, all aimed at ensuring that Plaintiffs' retained no interest in Warsun while Defendant Modern Africa continued Warsun's business, constituted a breach of its duty to Plaintiffs in their capacity as minority shareholders.

189.    Defendant Modern Africa, by exercising rights based upon its status as a creditor of Warsun to obtain full control over Warsun, despite the value of Warsun as a continuing entity, not only neglected its duties as controlling shareholder, but converted Plaintiffs' equity interest in Warsun.

190.    Defendants, based upon the acts inflicted on Warsun Nigeria and its property and employees as described above, converted Plaintiffs' equity interest in Warsun Nigeria, along with the value associated

26

with their right to purchase Warsun's interest in Warsun Nigeria.

191.    Defendants agreed to engage in a deliberate scheme to undertake the acts described above that harmed Plaintiffs, and in so doing conspired to engage in unlawful acts.

### COUNT ONE –
### BREACH OF FIDUCIARY DUTY OWED
### TO MINORITY SHAREHOLDERS
#### (Defendant Modern Africa)

192.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

193.    Defendant Modern Africa, as the controlling and majority shareholder of Warsun, owed a fiduciary duty to Plaintiffs as minority shareholders of Warsun.

194.    Defendant Modern Africa breached this duty owed to Plaintiffs by withholding funds from Warsun, restricting Warsun's ability to obtain funding, causing the Company to file for bankruptcy under improper circumstances, and otherwise implementing a deliberate scheme to squeeze out and oppress Plaintiffs as minority shareholders.

195.    As a direct and proximate result of Defendant Modern Africa's breach of its fiduciary duty, Plaintiffs have incurred a loss of the entire value of their interest in Warsun, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)    Award Plaintiffs compensatory damages of $5,000,000; and in addition

(b)    Award Plaintiffs punitive and exemplary damages in an amount in excess of 5,000,000; and in addition

(c)    Award Plaintiffs a reasonable attorney's fee and costs of this action including expert fees; and in addition

(d)      Award Plaintiffs such other and further relief as may be appropriate in

the circumstances.

**COUNT TWO-
CONVERSION OF PLAINTIFFS'
INTEREST IN WARSUN
(Defendant Modern Africa)**

196.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

197.    Defendant Modern Africa, in declaring a default on debts presumably due to it by Warsun, and

by causing Warsun to file for bankruptcy, exercised its rights as a presumed creditor of Warsun

notwithstanding the fiduciary duties it owed to Plaintiffs, and notwithstanding the fact that Modern

Africa's interest in Warsun may be characterized as equity rather than debt.

198.    In so doing, Defendants intentionally and unlawfully exercised dominion, control and ownership

over Plaintiffs' equity interest in Warsun.

199.    Defendants ignored and effectively repudiated the Plaintiffs' right to its equity stake in Warsun.

200.    As a direct and proximate result of Defendant Modern Africa's conversion of Plaintiff's equity

interest in Warsun, Plaintiffs have incurred a loss of the entire value of their interest in Warsun, a loss of

business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation,

stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)      Award Plaintiffs compensatory damages of $5,000,000; and in addition

(b)      Award Plaintiffs punitive and exemplary damages in an amount in

excess of 5,000,000; and in addition

(c)      Award Plaintiffs a reasonable attorney's fee and costs of this action

including expert fees; and in addition

28

(d)     Award Plaintiffs such other and further relief as may be appropriate in

the circumstances.

### COUNT THREE –
### CONVERSION OF PLAINTIFFS'
### INTEREST IN WARSUN NIGERIA
### (All Defendants)

201.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

202.    Defendants, by interfering with Warsun Nigeria's customers and business, by directing Warsun

Nigeria's accounts receivable to it, by repeatedly raiding its premises and intimidating its employees, by

asserting ownership over Warsun Nigeria's assets, and by seeking to compete against Warsun Nigeria,

effectively exercised intentional and unlawful dominion, control and ownership over Plaintiffs' interest

in Warsun Nigeria, including its prospective interest in the shares of Warsun Nigeria owned by Warsun.

203.    Defendants ignored and effectively repudiated Plaintiffs' right to the shares of Warsun Nigeria.

204.    As a direct and proximate result of Defendant's conversion of Plaintiff's equity interest in

Warsun Nigeria, Plaintiffs have incurred a loss of the entire value of their interest in Warsun Nigeria, a

loss of business opportunities, and other injuries, including, but not limited to, embarrassment,

humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)     Award Plaintiffs compensatory damages of $3,000,000; and in addition

(b)     Award Plaintiffs punitive and exemplary damages in an amount in

excess of 3,000,000; and in addition

(c)     Award Plaintiffs a reasonable attorney's fee and costs of this action

including expert fees; and in addition

(d)     Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

29

## COUNT FOUR –
### INTERFERENCE WITH PLAINTIFF'S
### PROSPECTIVE ECONOMIC ADVANTAGE
#### (All Defendants)

205.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

206.    Defendants, by interfering with Warsun Nigeria's customers and business, directing Warsun Nigeria's accounts receivable to it, repeatedly raiding its premises and intimidating its employees, asserting ownership over Warsun Nigeria's assets, and by seeking to compete against Warsun Nigeria, engaged in intentional, improper and unfair means of diverting business from Plaintiffs.

207.    Defendants were aware of and reasonably anticipated business opportunities that would accrue to Plaintiffs in their capacity as officers, directors and controlling shareholders of Warsun Nigeria.

208.    As a direct and proximate result of Defendant Modern Africa's interference with Plaintiff's prospective economic advantage, Plaintiffs have incurred a loss of the entire value of their interest in Warsun Nigeria, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)    Award Plaintiffs compensatory damages of $3,000,000; and in addition

(b)    Award Plaintiffs punitive and exemplary damages in an amount in excess of 3,000,000; and in addition

(c)    Award Plaintiffs a reasonable attorney's fee and costs of this action including expert fees; and in addition

(d)    Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

## COUNT FIVE –
## CONSPIRACY BY DEFENDANTS
## TO COMMIT UNLAWFUL ACTS
### (All Defendants)

209.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

210.    Each of the Defendants knowingly agreed to participate and collaborate in a deliberate scheme to squeeze out and oppress the minority shareholders of Warsun, to convert Plaintiff's interest in Warsun and to convert Warsun Nigeria's business opportunities for their own economic advantage.

211.    Defendants' knowingly relied upon a series of unlawful acts performed in pursuit of a common goal as part of their schemes, and thereby conspired to commit such acts.

212.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs have incurred a loss of the entire value of their interest in Warsun and Warsun Nigeria, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)    Award Plaintiffs compensatory damages of $8,000,000; and in addition

(b)    Award Plaintiffs punitive and exemplary damages in an amount in excess of 8,000,000; and in addition

(c)    Award Plaintiffs a reasonable attorney's fee and costs of this action including expert fees; and in addition

(d)    Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

31

## JURY TRIAL

**PLAINTIFFS HASSAN ABBEY AND YUSSUR ABRAR DEMAND A TRIAL BY JURY.**

February 14, 2003

Respectfully submitted,

Donald M. Temple
D.C. Bar No. 408749
TEMPLE LAW P.C.
1200 G Street, N.W., Suite 370
Washington, D.C. 20005
(202) 628-1101
Facsimile: (202) 628-1149

32