

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HASSAN ABBEY & YUSSUR ABRAR<br>1164 Silver Beech Road<br>Herndon, Virginia 20170<br><br>    Plaintiffs,<br><br>      v.<br><br>MODERN AFRICA ONE, LLC, a Delaware limited<br>liability company<br>1100 Connecticut Ave., N.W.<br>Washington, D.C. 20006<br><br>    Service on registered agent:<br>      Corporation Trust Company<br>      Corporation Trust Center<br>      1209 Orange Street<br>      Wilmington, Delaware 19801,<br><br>DISCOVERYTEL, INC., a Delaware corporation<br>1 Talcott Plaza<br>Hartford, Connecticut 06103<br><br>    Service on registered agent:<br>      Corporation Trust Company<br>      Corporation Trust Center<br>      1209 Orange Street<br>      Wilmington, Delaware 19801,<br><br>STEPHEN CASHIN<br>3120 Woodley Road, N.W.<br>Washington, D.C. 20008,<br><br>    and<br><br>NILES HELMBOLDT<br>Low Farthing Bank<br>Dumfriesshire, DG348H<br>Scotland, United Kingdom<br><br>    Defendants. | <br><br>Civil Action No. 1:03-cv-00259-ESH<br><br>JURY TRIAL DEMANDED<br><br><br>**AMENDED COMPLAINT** |

For their Complaint against Defendants, Plaintiffs allege as follows:

### NATURE OF THE ACTION

1.     This is a civil action arising out of a breach of a fiduciary duty owed to the minority shareholders

of Warsun International Communications Corporation ("Warsun" or the "Company"), the conversion of

Plaintiffs' assets, tortious interference with prospective business opportunities, conspiracy, and a

violation of the Racketeer Influenced and Corrupt Organizations Act of 1970, as amended ("RICO"), by

Defendant Modern Africa One, LLC ("Modern Africa"), Stephen Cashin and Niles Helmboldt, directors

of the Company and officers and agents of Modern Africa, and, with respect to certain actions, Defendant

DiscoveryTel, Inc. ("DiscoveryTel").  This action is brought under the common law of the District of

Columbia and the State of New York, and under applicable federal statutory law.

2.     With respect to the breach of fiduciary duty claim, this action involves a direct claim brought by

Plaintiffs, minority shareholders of Warsun, against Defendant Modern Africa in its capacity as majority

shareholder of Warsun, and Stephen Cashin and Niles Helmboldt, in their capacity as agents and officers

of Defendant Modern Africa and as directors of Warsun.

### THE PARTIES TO THIS ACTION

3.     Plaintiffs Hassan Abbey ("Abbey") and Yussur Abrar ("Abrar") founded Warsun as a New York

corporation in September of 1994, and have been, from that time until present, shareholders of Warsun.

Mr. Abbey and Mrs. Abrar are husband and wife.

4.     Plaintiffs were minority shareholders of Warsun at all times relevant to this Complaint.   In

addition, Mrs. Abrar served as President and Chief Executive Officer of the company, while Mr. Abbey

served as Senior Vice President.

5.     Plaintiffs were, at all times relevant to this complaint, and continue to be, residents of the

Commonwealth of Virginia.

2

6. Plaintiffs served as directors of Warsun Network Solutions, Ltd. ("Warsun Nigeria"), a Nigerian company owned jointly by Warsun, Plaintiff Yussur Abrar and Chidi Ibisi, Warsun Nigeria's manager.

7. Defendant Modern Africa is a Delaware limited liability company, with its principal place of business in the District of Columbia. It was established in 1997 for the purpose of making equity investments in Sub-Saharan Africa, particularly in manufacturing and communications enterprises, as an investment fund sponsored by the U.S. Overseas Private Investment Corporation, an agency of the United States government ("OPIC"), and private sector equity investors.

8. At all times relevant to this complaint, Defendant Modern Africa was the beneficial owner of a controlling and majority interest in Warsun. It acquired this interest pursuant to a Credit Agreement, dated August 20, 1999, by and between Modern Africa and Warsun, and a related Warrant Agreement to Purchase Common Stock.

9. Defendant Modern Africa maintained no direct interest in Warsun Nigeria.

10. Defendant DiscoveryTel, Inc. is a Connecticut corporation engaged in the provision of various telecommunications services. Officers and agents of DiscoveryTel have been employed by Warsun and Defendant Modern Africa, and served as agents for the same at times relevant to this complaint.

11. At all times relevant to this complaint, Defendant Stephen Cashin, a resident of the District of Columbia, has served as a member of the board of directors (the "Board") of Warsun and as a managing director of Modern Africa.

12. At all times relevant to this complaint, Defendant Niles Helmboldt, a resident of Scotland, has served as a Chairman of Warsun's Board and as Chairman of Modern Africa.

13. The term "Defendants" as used herein shall refer to Defendants Modern Africa, Stephen Cashin and Niles Helmboldt.

3

14.     The term "Enterprise Defendants" as used herein refers to all Defendants named in the instant complaint, including Defendant DiscoveryTel.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 (federal question) and 1332 (diversity of citizenship) and 18 U.S.C. §1964 (civil remedies under the RICO Act).

16.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. §1391(b) and (c) because substantially all of the fiduciary breaches and tortious conduct for which relief is sought occurred in this district, and the Defendants maintain their principal offices and conduct business in the district.

17.     Venue is also proper with respect to Defendant DiscoveryTel, Inc. because DiscoveryTel, for purposes of this Complaint, acts as the *alter ego* of, is an instrumentality or agent of, and is an enterprise integrated with Defendants. It is further shown by the circumstances of this Complaint that the ends of justice require that parties residing or headquartered in other districts be brought before this Court.

## FACTS COMMON TO ALL CLAIMS

### I.     *Overview of Facts*

18.     The relationship between Plaintiffs and Defendants began when Defendants, in their capacity as founders and managers of Warsun, secured investment funds from Defendant Modern Africa in 1999. Defendant Modern Africa acquired rights to 70% of the outstanding equity of Warsun, and a pledge of all remaining shares of Warsun, along with a security interest.

19.     While the Company had only a limited financial history, Defendant Modern Africa's interest in Warsun was characterized and documented as debt.

20.     Defendants managed and grew the business until August 2002, by which time Defendant Modern Africa had terminated Plaintiffs as managers of Warsun. Modern Africa, as a creditor and controlling

4

shareholder of Warsun, decided that Warsun should file for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

21.     The bankruptcy filing rendered Plaintiffs' interest in Warsun completely worthless. Nonetheless, Plaintiffs continued to own a separate, direct interest in Warsun Nigeria.

22.     The Defendants subsequently engaged in a continuing, conspiratorial pattern of illicit activities, conducted through Warsun, and later through Defendant DiscoveryTel, and otherwise amongst themselves, for the purpose of depriving Plaintiffs of their interest in Warsun Nigeria.

23.     Warsun and Warsun Nigeria maintained substantial value at the time of the bankruptcy filing.

24.     Upon information and belief, the Enterprise Defendants engaged in a deliberate, oppressive scheme to squeeze out Plaintiffs and convert Plaintiffs' entire interest in Warsun and Warsun Nigeria for their own benefit. Defendant Modern Africa thereby breached a fiduciary duty that it owed to Plaintiffs and, in the end, the Enterprise Defendants converted Plaintiffs' interests.

25.     At all times relevant to this complaint Plaintiffs performed their respective duties as officers and directors of Warsun with the utmost care, loyalty and good faith.

26.     Defendants' actions were deliberate, conspiratorial and malicious.

**II.     *Plaintiffs' Initial Involvement with Defendant Modern Africa***

27.     Prior to 1999, Warsun engaged primarily in the sale of prepaid calling cards to immigrant communities within the United States. *Inter alia*, the Company (i) entered into arrangements with carriers to carry and terminate calls made on their calling card platform; (ii) entered into service agreements and capacity leases with carriers; and (iii) invested in and provided software systems and equipment to track and monitor customer calls.

28.    In an effort to develop a facilities-based telecommunications business in Africa, Plaintiffs developed substantive business relationships with carriers in the United States and Africa, some of which had the potential to develop into very lucrative arrangements for Warsun.

29.    For example, Plaintiffs secured the opportunity for Warsun to enter into an arrangement with Morocco Post, Telephone & Telegraphs ("Morocco Telecom"), whereby Warsun would connect its equipment to Morocco Telecom's network in order to deliver and receive voice, data and Internet signals.

30.    Such arrangements with monopoly and other large carriers, to be fully utilized, required established interconnections with large international carriers. Such interconnections would enable Warsun to deliver and receive voice, data and Internet traffic in large volumes.

31.    Relatively large capital investments were required in order to pursue such arrangements.

32.    Therefore, in August 1999, Plaintiffs accepted a commitment by Modern Africa to invest $6 million in the Company.

### III.    *Modern Africa Obtained a Controlling Interest in Warsun, Thereby Assuming a Fiduciary Duty to Plaintiffs, and Immediately Came to Dominate and Control the Affairs of Warsun*

33.    In September 1999, in exchange for its $6 million commitment, Modern Africa acquired, among other consideration, warrants for seventy percent (70%) of the outstanding capital shares of Warsun, along with a promissory note and security interest to secure its investment in the form of a loan.

34.    The investment documents contained no due date for principal under the purported loans. Further, the course of conduct between the parties suggests that no expectation for periodic repayment of interest existed. The parties established no reserve funds for the purpose of repaying the purported debts due to Modern Africa.

35.    At the time of Defendant Modern Africa's initial investment, Warsun did not have sufficient historical cash flow to justify a debt investment of the magnitude supplied by Modern Africa.

36.     Upon information and belief, no bank or similar financial institution would have extended such a loan to Warsun without a substantially greater sum of cash or liquid assets available from the Company as equity. Further, financial institutions customarily investing in early stage ventures such as Warsun acquire shares of a preferred class, rather than actual debt, as consideration for their investment.

37.     Notwithstanding its characterization of its interest in Warsun as debt rather than equity, Defendant Modern Africa, based upon the terms of its investment in Warsun, came to dominate and control the Company following its investment .

38.     Based upon the terms of Modern Africa's investment in Warsun and the Company's capital structure, its interest could properly be characterized as equity.

39.     For example, Defendant Modern Africa demanded, attained and exercised the right to appoint a controlling majority, five out of eight, of the directors that comprised Warsun's Board.

40.     At all times following Modern Africa's initial investment in Warsun, the directors it appointed were its employees and, as such, were beholden to its interests.

41.     Also, Defendants closely monitored virtually all of the decisions and activities of Warsun, and maintained intimate knowledge of Warsun's financial and business affairs.

42.     For instance, Defendants demanded and maintained copies of Warsun's customer contracts, monthly sales and marketing reports, daily cash flow reports and projections, as well as monthly cash flow statements.

43.     Until Mrs. Abrar protested in the Spring of 2001, Defendants required daily telephone reports from Mrs. Abrar regarding events that occurred and decisions to be made by Plaintiffs in operating the Company. Further, monthly Board meetings were convened to provide Defendants with a comprehensive review of all of the Company's activities.

7

44.     Defendants, without the participation or foreknowledge of Plaintiffs, routinely held direct meetings with Warsun's management team, including its Chief Operating Officer, lead Engineers, Chief Technical Officer and Chief Financial Officer to discuss matters relating to Warsun's business.

45.     Defendants routinely prepared *pro forma* financial statements for Warsun, particularly in connection with each draw down request it received from Warsun's management team.

46.     Whenever Warsun requested a draw on financing commitments made by Modern Africa, Defendants would engage in a wholesale review of the Company's activities and business plans, rather than review and analyze Warsun's prior and planned use of proceeds and general financial condition, which resulted in substantial and unnecessary funding delays.

47.     On several occasions, Plaintiffs were forced to consider layoffs and abandoning planned capital expenditures and components of their business plan as a direct result of the prolonged and repeated funding delays created by Defendants.

48.     Defendants also directed and managed some significant operational matters of the Company.

49.     For instance, Warsun required satellite bandwidth capacity to deliver telecommunications traffic to and from select customers in Africa. To ensure that the Company had sufficient revenues to cover the costs of such satellite bandwidth capacity, Plaintiffs preferred that Warsun procure such capacity on an as-needed basis while its customer base grew.

50.     Yet, in early 2001, Defendant Modern Africa informed Plaintiffs that it would no longer fulfill its funding commitments to Warsun unless the Company entered into and provided evidence of, a long-term commitment to purchase substantial satellite bandwidth capacity.

51.     Defendants' decision and coercive interference caused Warsun to enter into a long-term commitment that, along with related costs, consumed approximately 70% of the Company's monthly operating expenditures.

52.     Still further, despite indicating its support for an employee stock option plan for Warsun's employees both prior and subsequent to Modern Africa's investment in Warsun, Defendants, steadfastly refused to allow the implementation of a stock option plan for Warsun employees.

53.     As the controlling shareholder of Warsun, Defendant Modern Africa owed a fiduciary duty to Plaintiffs in their capacity as minority shareholders of the Company.

54.     To the extent that Modern Africa may be regarded as a creditor of Warsun, in addition to owing a fiduciary obligation to Plaintiffs as controlling shareholder, Defendant Modern Africa owed a duty of good faith to Warsun.

55.     In order to free Warsun from Defendants' detrimental influence, Plaintiffs sought other investors for the Company.

*IV.     Modern Africa Adversely Controlled Warsun's Access to Capital*

56.     A substantial portion of the capital advanced by Modern Africa ($10 million) was received in delayed tranches. These funds were primarily used to plan, develop and provide a telecommunications network, which included satellite and fiber lease costs, and to cover salaries and other customary overhead costs, all with the full knowledge and consent of Defendants.

57.     Defendant Modern Africa was fully aware that, based upon the business plan it endorsed for Warsun and their mutual vision for the Company's progress, Warsun required additional outside funding in order to meet its business and operating objectives.

58.     Plaintiffs engaged in a comprehensive search for additional capital.

59.     For example, Plaintiffs unsuccessfully attempted to obtain an operating line of credit for Warsun to fund current liabilities. Numerous banks declined to extend the line due to Modern Africa's large credit interest and blanket security lien in the Company.

9

60.     Plaintiffs repeatedly requested that Defendants either (i) convert some or all of Modern Africa's debt in Warsun to equity; (ii) provide assurances to prospective investors that it would convert its interest; or (iii) at least guarantee a line of credit in order to facilitate outside financing for Modern Africa.

61.     Despite Modern Africa's explicit endorsement of Plaintiffs' search for outside capital, and prospective investors request that such actions be taken, Defendants consistently refused to do either.

62.     On several occasions, officers of Defendant Modern Africa accompanied Plaintiffs to meetings with prospective investors. Upon information and belief, Defendants used these meetings to solicit funds for their own purposes, and, on at least one occasion, deliberately undermined and denigrated Warsun's own fundraising efforts.

63.     Compounding these problems, Defendants consistently delayed in funding Plaintiffs' requests for draw downs from Modern Africa on its initial $6 million, and subsequent $4 million, investment.

64.     Furthermore, Defendants often provided less funding than had been requested by Plaintiffs. Coupled with Defendants' refusal to accommodate a line of credit for Warsun, such delays and shortfalls had a direct, substantial and adverse impact on the Company's operations and trade payables balance from time to time.

65.     In early 2002, as Plaintiffs searched for additional capital for Warsun, Defendants orally committed to invest an additional $1 million in the Company and, upon information and belief, obtained investment committee approval for the investment.

66.     However, the Defendants withheld the additional investment for several months, despite Warsun's dire and express need for the capital to close on and begin implementation of a number of key customer relationships.

10

67.     From time to time, the telecommunications market in the United States suffered through calamities, such as the steep decline following the events of September 11, 2001, which resulted in the destruction of key Warsun soft billing platform and peering components.

68.     Given Warsun's connections to multi-national carriers, for whom it carried voice, data and Internet traffic to and from Africa, these events had a tremendous and adverse effect on the Company's financial performance.

69.     Despite repeated requests from Plaintiffs, Defendants failed to provide adequate capital to Warsun under these circumstances, or to allow Warsun to obtain such capital from outside investors.

70.     The adverse impact that Defendants' debt interest had on Warsun's balance sheet also adversely impacted Warsun's ability to transact business with the large international carriers, who comprised a significant segment of its target customer base.

71.     Upon realizing that the Company was heavily leveraged (due exclusively to Modern Africa's interest), international carriers that evaluated the Company's balance sheet and creditworthiness declined to transact business with Warsun for fear that Warsun was a poor credit risk.

72.     As a result of the foregoing issues relating to Warsun's financial situation, Warsun was consistently unable to generate substantial increases in revenues and income from its international operations, exacerbating its need for capital to fund its operations and business plan.

73.     Defendant Modern Africa's failure to act in good faith prevented Warsun and Plaintiffs from obtaining any additional outside capital and failed to provide sufficient amounts of its own funds necessary to fund their mutual vision for the Company, its operations and business plan.

11

**V.    *Notwithstanding Modern Africa's Refusal to Adequately Finance Warsun, Plaintiffs Added a Substantial Component to Warsun's Business Plan by Establishing Warsun Nigeria***

74.    To complement the development of its network in the United States, Warsun's business plan contemplated the development of Internet Protocol ("IP") "gateways" throughout Africa.

75.    Such gateways are comprised of state-of-the-art, relatively low-cost telecommunications equipment and software systems that would enable Warsun's African affiliates to deliver and receive significant amounts of voice, data and Internet traffic from local Internet Service Providers ("ISPs") and telecommunications carriers.

76.    The gateways would connect to Warsun's international network, delivering and receiving an increasing amount of telecommunications traffic.

77.    In August 2000, Warsun established Warsun Network Solutions, Ltd. ("Warsun Nigeria") in Nigeria in order to obtain telecommunications licenses and establish a facilities-based gateway in Nigeria, the largest market in Africa.

78.    Plaintiffs obtained several valuable, non-transferable telecommunications licenses for Warsun Nigeria from the Nigerian government.  These licenses are extremely difficult for foreign-based carriers to obtain.

79.    Warsun Nigeria completed the build-out of its gateway by September 2001, and subsequently developed a customer base of dozens of Nigerian ISPs, as well as wireless and fixed-line telecommunications carriers. This telecommunications platform was worth several million dollars.

80.    Warsun Nigeria generated a positive cash flow shortly after commencing operations, and paid a substantial part of its earnings to Warsun.

12

81.     Plaintiffs and Warsun owned Warsun Nigeria jointly from its inception, along with Chidi Ibisi, manager of Warsun Nigeria.

82.     Warsun Nigeria's Articles of Association provided that the shareholders of Warsun Nigeria maintained a right to purchase the shares of any other Warsun Nigeria shareholder who declared bankruptcy or became insolvent.

83.     Warsun Nigeria was a separate legal entity from Warsun, maintaining a separate board of directors and management team, as well as a separate bank account and separate corporate records.

## VI.     *Plaintiffs Developed Warsun into a Valuable Franchise Poised to Take Full Advantage of Tremendous Opportunities in the African Telecommunications Market*

84.     From the date of Modern Africa's initial investment in Warsun until August 2002, Warsun developed a valuable telecommunications franchise throughout Africa and the U.S.  By August 2002, the Company was well known throughout the U.S. and African telecommunications markets.  Carriers sought relationships with the Company because of its focus on a limited, lucrative geographic market.

85.     Warsun planned to constructing and operating telecommunications gateways in new markets in Africa, in addition to Nigeria, that would enable Warsun to expand its local customer base of ISPs and telecommunications carriers, and to eventually provide certain retail services through its customers.

86.     Warsun and Warsun Nigeria had opportunities available to them to construct nationwide VSAT satellite networks throughout Africa.

87.     In 2001, Warsun became one of few select carriers throughout the world to obtain an allotment of IP addresses from RIPE (Réseaux IP Européens), the regional Internet registrar for Africa and the Middle East.  This allotment essentially ensured that, over time, as Warsun's Internet customer base

13

expanded across Africa and as its presence as an Internet access provider increased, Warsun would garner a significant portion of any and all Internet traffic (voice and data) to and from Africa.

88.     A partial valuation of owner's equity, prepared by Ernst & Young in June 2001, valued Warsun at approximately $100 million on the assumption that it receive a $40 million investment.

89.     Defendants were well aware of the Company's value, having prepared pro forma financial statements for Warsun on a regular basis and having evaluated prospective business opportunities for Warsun that would return the Company to financial stability following the events of September 11, 2001.

90.     Warsun had generated significant brand recognition throughout Africa and, by late 2001, had finally developed a substantial presence in the market place from which to court monopoly carriers and other substantial carriers throughout Africa.

91.     As late as January 2002, the Defendants indicated, in writing, that a historical valuation for Warsun of at least $14 per share, or roughly $16.8 million total, represented a "fair" valuation.

92.     The Company forged a large and significant business relationship with SierraTel, the government-owned monopoly telecommunications carrier from Sierra Leone. From April to July 2002, that relationship actually began to generate substantial accounts payable and receivable for Warsun. These amounts were expected to increase nearly five-fold, as SierraTel planned to disconnect, and, in some cases had begun disconnecting, international carriers who carried traffic to and from Sierra Leone. Plans also included Warsun deploying VSAT and GSM networks throughout Sierra Leone, both of which could have generated substantial revenue and income for Warsun.

93.     Warsun also successfully competed to deliver services to Eco Bank in Nigeria, resulting in an arrangement that could generate approximately $100,000 per month in revenue for the Company.

94.     Plaintiffs, in the Spring of 2002, successfully procured a subcontract involving the U.S. Agency for International Development ("U.S. AID"), to build satellite earth stations, provide Internet access to

14

the worldwide Internet backbone and provide IP addresses for Eritrea's monopoly carrier, thereby ensuring that all Internet traffic passing in and out of Eritrea transited through Warsun's network.

95.    Upon information and belief, Warsun was likely to obtain similar U.S. AID contracts for other countries throughout Africa.

96.    Nonetheless, in August 2002, despite the Company's encouraging financial outlook, Defendant Modern Africa determined that Warsun should file for voluntary bankruptcy.

97.    As of August 2002, excluding Defendant Modern Africa's interest in Warsun, the Company had no creditors other than those whose debts accrued in the ordinary course of business.

98.    But for Defendants' failure to deliver the $1 million investment agreed upon by Defendant Modern Africa and its investment advisors or to facilitate a line of credit for the Company, Warsun would not have been delinquent or otherwise in default of its trade credit obligations.

99.    The telecommunications licenses held by Warsun Nigeria possessed substantial value, based upon the size and potential of the telecommunications market in Nigeria.

100.    Warsun was well positioned to obtain similar licenses from other jurisdictions throughout Africa on its own behalf.

101.    Even following Warsun's voluntary bankruptcy filing in August 2002 and the resulting precipitous decline in the Company's customer and revenue base, Modern Africa loaned or invested an additional $1 million in Warsun and purchased substantially all of Warsun's assets for consideration equal to $6.1 million.

102.    Prior to the bankruptcy filing, Plaintiffs planned and implemented several significant steps to increase the profitability of the Company, including acquiring a telecommunications switch in the U.S. to handle a larger volume of traffic at a lower cost, and planning to shift a substantial part of Warsun's operations to Africa.

15

103.    In addition, Plaintiffs also renegotiated Warsun's satellite bandwidth commitments in 2002, reducing their commitment by one-half, or roughly $100,000 per month.

104.    At the time of the bankruptcy filing, profit margins from voice and data services throughout Africa remained substantially higher than in other markets.

105.    For certain technologies, such as wireless and IP telephony, Africa, unlike the U.S. and other developed markets, presented an abundant growth opportunity for small carriers and entrepreneurs.

106.    Warsun, as a result of its unique position as a wholesale telecommunications carrier with established connections to African customers and markets, was perhaps better positioned than any other facilities-based international carrier to take advantage of tremendous opportunities available in the African telecommunications space.

107.    But for Modern Africa's would-be debt interest in Warsun, Warsun maintained low levels of debt by industry standards, a valuable characteristic for a facilities-based telecommunications carrier engaged in the provision of wholesale telecommunications services.

108.    As a result of its status as a regional, specialized carrier focused on Africa, Warsun maintained interconnections with numerous telecommunications carriers, including Sprint, Teleglobe, Level 3, Qwest, Bell South, Primus, Deutsche Telecom, TeleDenmark, Telenor, Colt Telecom, and others.

109.    But for the Defendants' failure to act in good faith during the course of their dealings with Warsun and Plaintiffs, Warsun could have obtained funding or a line of credit from additional sources, and/or significantly expanded its customer and revenue base.

16

**VII.** *Despite Warsun's Potential Value, Defendant Modern Africa Increased its Control and Dominance Over Warsun to the Detriment of Warsun's Minority Shareholders*

110.     Defendants exercised direct control over day-to-day operations through a variety of means to the exclusion of Plaintiffs beginning in January 2002.

111.     Defendants steadfastly refused to take steps to enable Warsun to implement an employee stock option plan, even after Plaintiffs indicated their willingness to set aside shares to which they were entitled for this purpose.

112.     With respect to each drawdown request, Defendants threatened to withhold funds, and extracted or attempted to extract additional concessions from Plaintiffs.

113.     Beginning in January 2002, the Defendants increased the regularity with which they met directly with officers and employees of the Company, without the participation of Plaintiffs and in contravention of Plaintiff Abrar's duties as Chief Executive Officer.

114.     Defendants ignored suggestions made by Plaintiffs with regard to the Company's fundraising needs, proposed cost-cutting measures and other matters.

115.     Defendants shunned and marginalized Plaintiffs and Warsun's African employees, who collectively maintained substantial influence and connections with respect to the African marketplace, and constituted Warsun's entire marketing and customer relations team.

116.     In early 2002, Defendants supplanted Warsun's employees and management team and replaced them with several consultants who had little or no experience or connections in Africa.

117.     The consultants had been retained ostensibly for the purpose of advising Defendants on a proper course of action for Warsun, and ultimately, upon information and belief, for the purpose of managing the company following Defendants' termination of Plaintiffs.

118.     All but one of the consultants received their compensation directly from Modern Africa.

17

119. The consultants effectively took over the management of Warsun. They met with Warsun's officers and employees without the participation of Plaintiffs, participated in the preparation of certain reports, took over certain contract negotiations, and reported directly to Defendants.

120. The Defendants' treatment of Warsun's managers and employees and its refusal to provide additional fund and funding on a timely basis damaged morale and employee performance, and created substantial ongoing operational problems for Warsun throughout 2002.

121. Early in 2002, sensing tension between Defendants and Plaintiffs' management team, Plaintiffs suggested to Defendants that the parties discuss, among several issues, possible severance for Plaintiffs in the event that Defendants desired to replace them, the appointment of disinterested directors, conversion of Modern Africa's purported debt interests to equity, and a full accounting for Warsun's capital structure.

122. Defendants ignored Plaintiffs' suggestions and failed to issue any statements clarifying matters for the Company's work force.

123. Upon information and belief, throughout much of 2002, Defendants constantly reviewed and monitored all of Plaintiffs' e-mail correspondence and computer files.

124. In July 2002, Defendants developed and presented false and misleading *pro forma* financial statements to Warsun's Board that cast Warsun's future performance in an unjustifiably negative light. The statements included debts that did not exist, and projected revenues below recent historical figures.

125. In late July 2002, based in part upon the misleading financial statements and other false assertions, Defendant Modern Africa terminated substantial parts of Warsun's management team and marketing staff, including all of the Company's staff members who maintained strong relationships with the Company's customers, and constructively removed Plaintiffs as directors of the Company.

18

126.    As customers of Warsun realized that the employees responsible for their accounts had become terminated from their positions with the Company, the customers significantly reduced or severed their business dealings with the Company.   For instance, SierraTel immediately terminated its relationship with Warsun upon learning of its bankruptcy filing.

127.    Defendants granted no severance pay to Plaintiffs and the terminated employees, and refused to reimburse them for their reasonable business expenses.

128.    From early 2002 until the bankruptcy filing, Defendant Modern Africa assumed complete control and domination over the affairs of Warsun.

129.    Upon information and belief, Defendants commissioned individuals to follow and physically intimidate Plaintiff Abrar in an effort to encourage or force her to resign from Warsun's management, causing her to fear for her safety and the safety of her family members.

**VIII.    *Warsun's Relationship with Defendant DiscoveryTel Commenced in 2002***

130.    Officers and agents of Defendant DiscoveryTel first contacted Plaintiffs in early 2002 to discuss the possibility of doing business.   Defendant DiscoveryTel's agents represented that they had the capacity and ability to bring significant revenues to Warsun and would also be willing to work as the Company's employees.

131.    Plaintiff Abrar subsequently retained the services of David Rueben, a principal from DiscoveryTel, on a contractual basis.

132.    Plaintiffs terminated Mr. Rueben's services shortly after learning of the terms of the proposed contract with Defendant DiscoveryTel, which were entirely unfavorable to Warsun and would have resulted in financial losses to the Company.

19

133.    Upon information and belief, Defendant DiscoveryTel maintained an ongoing relationship with Defendant Modern Africa. Modern Africa ultimately obtained a substantial equity stake in DiscoveryTel in exchange for DiscoveryTel's acquisition of substantially all of Warsun's assets.

## IX.   *Defendants Took Several Steps Intended to Severely Diminish or Squeeze Out Plaintiffs as Minority Shareholders of Warsun*

134.    Upon information and belief, the Defendants had discussed compensation to be paid by Warsun and other employment terms with the consultants, and considered the issuance of a substantial amount of equity (over 10%) to the consultants.

135.    One of the consultants, Bruce Kraselsky, after private discussions with Defendant Modern Africa, presented a proposal to Plaintiff Abrar confirming his understanding that, upon his assumption of the role of President of Warsun, he would be entitled to the issuance of a substantial equity interest in Warsun (equal to 10% or 1/3 of Plaintiffs' entire interest in Warsun) and a base salary higher than that earned by Plaintiff Abrar.

136.    The Company's cash flow would also not support the addition of salaries for several new senior managers. Defendant Modern Africa itself paid the salaries of all but one of the consultants.

137.    For the next several months, Defendants took steps to terminate Plaintiffs as officers of the Company and to supplant them with the consultants.

138.    Because Defendants had failed to implement a stock option plan on behalf of the management team selected by Plaintiffs, and prepared to issue an equity award to the consultants that equaled approximately one-half of Plaintiffs' interest in the Company, Plaintiffs informed Defendants that the proposal was not reasonable or appropriate at that time.

139.    Defendant Modern Africa, on each occasion when it provided funds to Warsun, sought a greater share of Warsun's outstanding equity interests for itself.

20

140.   For example, in connection with its $6 million investment in Warsun it obtained warrants to acquire 700,000 shares (or a 70% equity stake) of Warsun's capital stock at a per share price equal to $8.57. In connection with a subsequent $3 million investment, it obtained the right to convert its interest to shares of Warsun's capital stock at a price equal to $14 per share.

141.   Following the second round of financing, Defendants informed Plaintiffs of their willingness to loan funds to Warsun on terms that did not include any equity component. Plaintiffs had repeatedly informed Defendants of the need to have access to an operating line of credit, and insisted that it was not proper to have to negotiate over the issuance of substantial equity interests in the Company in connection with requests for funds that could have been supplied through such a line of credit.

142.   Still, in June and July 2002, Plaintiffs received proposed documents relating to Defendant Modern Africa's contemplated $1 million investment that contained terms, adverse to the interest of Plaintiffs, that had not been discussed prior to delivery of the draft, including the creation of a new class of preferred shares to be issued to Defendants upon conversion at a conversion rate of $14 per share, and a 16% interest rate, 6% higher than under prior credit agreements.

143.   The proposed loan transaction and pending management change would have unreasonably diluted Plaintiffs' interest in Warsun.

144.   Had Defendants acted in good faith to facilitate outside financing, any lender or investor would likely demand a priority interest or preference that would be equally dilutive of Defendant Modern Africa and Plaintiffs alike. Similarly, to the extent the parties sought new management, equity compensation plans would be dilutive to all shareholders and not just Plaintiffs, and would have been at levels more customary for early stage companies and more palatable for Plaintiffs.

21

**X.**    ***Defendants Lacked Support or Justification for Squeezing Out Warsun's Minority Shareholders***

145.    Defendants, upon information and belief, have alleged that bankruptcy was an appropriate option for Warsun for the following reasons, among others: (i) Warsun's financial performance was extremely poor, and Defendant Modern Africa could no longer justify additional financial commitments to the company; (ii) bankruptcy presented a viable alternative for the company's future, and (iii) Plaintiffs severely mismanaged Warsun and its resources.

146.    Defendant Modern Africa relied upon misleading financial projections and, upon information and belief, has alleged that Warsun's future financial prospects were severely weakened as a result of the Company's failure to consummate a significant customer agreement with SierraTel.

147.    Warsun not only closed on an agreement with SierraTel, but also began an interconnection arrangement in the early summer of 2002.

148.    Defendants had actual knowledge of this relationship, and had relied expressly upon the potential success of the relationship in making key decisions relating to Warsun's future.

149.    SierraTel terminated its relationship with Warsun only upon learning of (i) Modern Africa's dismissal of Plaintiffs and the Company's core employees and (ii) Warsun's bankruptcy filing.

150.    Defendants also relied upon the existence of delinquent trade payables in denigrating Warsun's financial performance. Yet, Modern Africa's (i) continual delayed funding of Warsun; (ii) failure to facilitate a line of credit or other outside source of funds; and (iii) failure to invest the additional $1 million agreed upon greatly exacerbated Warsun's difficulties in managing its trade payables account.

151.    Upon information and belief, in considering bankruptcy as a viable option, Defendant evaluated the Company purely from a creditor's perspective, notwithstanding the fact that Defendant Modern Africa controlled Warsun and effectively maintained an equity interest in the Company.

152. Defendants relied upon the advice and counsel of the consultants it supplied to Warsun and principals of Defendant DiscoveryTel in assessing the Company's financial performance and considering its alternatives as a debtor-in-possession under Chapter 11 of the U.S. Bankruptcy Code.

153. These advisors did not constitute disinterested parties and had insufficient experience with respect to bankruptcy proceedings and the telecommunications industry in Africa.

154. Upon information and belief, Defendants consulted no other professional, financial advisors in deciding to cause Warsun to file for bankruptcy protection.

155. Defendants had insufficient grounds upon which to cause Warsun to file for bankruptcy and eliminate Plaintiffs as minority shareholders of Warsun.

156. Defendants' bankruptcy petition was wrought with substantial inconsistencies and errors, discussed *infra* at Section XI.

157. Shortly after Defendants caused Warsun to file for Chapter 11 protection, Plaintiffs notified the Company, then under the control of Defendant Modern Africa, of their right to purchase all of its interests in the outstanding equity shares of Warsun Nigeria pursuant to Warsun Nigeria's Articles of Association and Nigerian law.

158. In retaliation for Plaintiffs' assertion of their rights to purchase all of Warsun Nigeria from its bankrupt shareholder, Defendants asserted that Plaintiffs mismanaged Warsun.

159. At no time prior to the filing of Warsun's bankruptcy petition had Defendants levied criticisms of Plaintiffs' management performance. In fact, Defendants previously commended Plaintiff Abrar's management, including her diligence in maintaining the Company's finances.

160. In 2002, Defendants critiqued Plaintiffs' leadership as a "Mom and Pop" operation and, upon information and belief, alleged that Plaintiffs misappropriated Warsun's funds.

23

161.     Defendants' allegations regarding Plaintiffs' mismanagement of Warsun were completely unfounded. At no time did Plaintiffs misappropriate Warsun's funds for their own personal use. Rather, Plaintiffs carefully accounted for all funds received or expended by Warsun and provided Defendants with daily reports.

162.     The team that Defendants selected to replace Plaintiffs, which included principals of Defendant DiscoveryTel possessed less direct experience than Plaintiffs. They failed miserably in their efforts to preserve Warsun's business and develop or retain its customer base.

163.     Thus, Defendant's breach of its duties to Plaintiffs had a direct and immediate adverse impact on Warsun's business and financial prospects.

## XI.     *The Defendants' Conduct Leading to the Filing of the Bankruptcy Petition Was Tainted by a Lack of Good Faith, Deception and Possible Fraud*

164.     At no time did Defendants present a plan to Plaintiffs, in their capacity as directors and minority shareholders, recommending the replacement of Plaintiffs as managers of Warsun, despite Plaintiff Abrar's suggestion to that they do so in lieu of causing the Company to file for bankruptcy protection.

165.     Substantial problems exist with respect to Defendant Modern Africa's exercise of remedies available to it as a creditor.

166.     For instance, Defendants failed to appoint disinterested directors, as suggested by Plaintiffs and as would be consistent with their fiduciary duty to Plaintiffs, to oversee its decisions with respect to the declaration of defaults on debts held by Modern Africa and the bankruptcy filing.

167.     On July 26, 2002, upon information and belief, Defendant Modern Africa notified Warsun's bankers of a default on debts allegedly due to Modern Africa pursuant to its initial investment in Warsun. Although the Company was not actually in default under applicable credit agreements, Modern Africa foreclosed on its bank accounts.

24

168.    On August 9, 2002, upon information and belief, Defendant Modern Africa declared a default on debts allegedly due from Warsun under the second extension of credit.

169.    At that time, Warsun was not in default of any material debt obligations, including obligations to Defendant Modern Africa.   Trade payables, to the extent delinquent, were manageable, and Plaintiffs paid them off in the ordinary course of business.  No creditors had filed suit against Warsun or obtained any judgment or lien against the Company's assets.

170.    Under the credit agreements, interest payments were due in November of each year,  rolled into principal if not paid, and were deemed repaid immediately upon a conversion of the credit to equity in Warsun.

171.    Both investment agreements provided Warsun with a ten (10) day period to cure from the date of notice of a default.  The Company never received proper notice of either default and was therefore denied the agreed upon opportunity to cure.

172.    Based upon the terms of the credit agreements and the parties' subsequent course of conduct, Defendants' declaration of default constituted a failure to act in good faith, and a breach of Defendant Modern Africa's contractual obligations to Warsun.

173.    After declaring the defaults, Defendant Modern Africa converted their entire debt interest into equity pursuant to the credit agreements, which provided that all such debt would be extinguished upon conversion.

174.    Further, under the credit agreements, any conversion of debt to equity was to be applied first as repayment of Warsun's interest and current obligations due under the agreements.

175.    Defendants were not entitled to simultaneously declare a default of the obligations and to convert the obligations to equity.

176.    A creditor who exercises control over a debtor owes a duty of good faith to the debtor.

25

177.     To the extent that Warsun's outstanding trade debts could be regarded as having triggered a default under either of the credit agreements, such defaults would not have occurred if the Defendants had conducted themselves in good faith.

178.     On August 13, 2002, just four days after declaring a default and prior to the expiration of any applicable cure period, Defendant Modern Africa caused Warsun to file a voluntary bankruptcy petition (the "Bankruptcy Petition") for relief under Chapter 11 of the United States Bankruptcy Code with the Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

179.     Immediately thereafter, Defendant Modern Africa supplied Warsun with the $1 million investment of funds.

180.     Defendant Modern Africa's conduct constituted a violation of applicable duties of good faith owed by it to Warsun, based upon its status as a creditor.

181.     Quite foreseeably, Warsun's customers ceased to pay on accounts owed or terminated their arrangements with the Company entirely, which led to a precipitous decline in Warsun's business and a complete loss of the value of Plaintiffs' interest in the Company.

**XII.     *The Defendants and Defendant DiscoveryTel Engaged in a Deliberate Scheme and Enterprise Aimed at Squeezing Out Plaintiffs and Converting Plaintiffs' Interests in Warsun and Warsun Nigeria***

182.     Upon information and belief, Enterprise Defendants had every intention of controlling Warsun during and after the relevant bankruptcy proceedings.

183.     Documents filed with the Bankruptcy Court at Defendants' direction contained several egregious inconsistencies and misstatements, including misleading information regarding Modern Africa's debt and equity interests in Warsun and the ownership status of select assets of Warsun and Warsun Nigeria.

184.     These inconsistencies and misstatements had the common effect of enabling the Enterprise Defendants to control Warsun to the exclusion of any other interested parties.

26

185.   For example, Defendants indicated that Warsun's telecommunications switch, located in Reston, Virginia, had been sold by Warsun on May 10, 2002. Defendants later indicated that the switch had never been sold and that Defendant Modern Africa intended to maintain control over the switch.

186.   Upon information and belief, principals of Defendant DiscoveryTel established offices at the site of Warsun's switch in Reston, Virginia immediately upon the filing of the petition. They worked closely with Defendants to operate and manage Warsun.

187.   Upon information and belief, Defendant DiscoveryTel used or attempted to use the switch for both Warsun's and its own business purposes following the filing of Warsun's bankruptcy petition.

188.   The switch was never made available to third parties who may have been interested in Warsun's assets, which were to be auctioned pursuant to bankruptcy rules.

189.   The only plan for the Company presented to the Bankruptcy Court by Warsun, operating under the control of the Enterprise Defendants, involved the sale of substantially all of the assets of Warsun to Defendant Modern Africa.

190.   Defendants falsely alleged that a default had occurred as a justification for the bankruptcy filing.

191.   In the bankruptcy petition, Defendants alleged that they maintained a controlling interest in Warsun as a result of their conversion of Defendant Modern Africa's debt interest in Warsun.  The alleged default was inconsistent with Defendant Modern Africa's would-be conversion of its entire debt interest in the Company.

192.   Defendants relied upon Modern Africa's status as a secured, priority creditor of Warsun in order to control the process by which Warsun's assets were offered for sale through the bankruptcy process.

193.   Upon information and belief, potential third party investors were dissuaded from pursuing Warsun's assets because of the blanket security lien allegedly held by Defendant Modern Africa, and the potential cure amount that Modern Africa would have required of a third party.

27

194.    Unlike other potential purchasers, Defendants were able to simply waive rights to repayment of Modern Africa's would-be debt as consideration for rights to Warsun's assets, rather than actually paying cash consideration to a secured creditor.

195.    Upon information and belief, Enterprise Defendants contemplated the sale of Warsun's assets by Modern Africa to DiscoveryTel in exchange for a substantial equity interest in Defendant DiscoveryTel.

196.    Thus, Enterprise Defendants implemented a deliberate, calculated and malicious scheme to force Plaintiffs out as minority shareholders of Warsun.

*XIII.    The Enterprise Defendants Constituted an Association-in-Fact*

197.    Modern Africa, DiscoveryTel, Stephen Cashin and Niles Helmboldt, along with others known and unknown (collectively, the "ENTERPRISE"), were associated-in-fact.

198.    The purpose of the ENTERPRISE was to manage and operate the business of Warsun, to the exclusion of any interest held by Plaintiffs, and to convert Plaintiffs' entire interest in Warsun Nigeria.

199.    Defendants Modern Africa, Cashin and Helmboldt supervised and managed the takeover of Warsun and the attempted takeover of Warsun Nigeria.

200.    Defendant Modern Africa then transferred its entire interest in Warsun to Defendant DiscoveryTel in exchange for a substantial equity stake in DiscoveryTel.

*XIV.    The Enterprise Defendants Have Participated in Ongoing Racketeering Activities In Connection with their Conversion of Plaintiffs' Interest in Warsun Nigeria*

201.    The objective of the ENTERPRISE was substantially frustrated in late August 2002 when Plaintiffs delivered notice to Defendant Modern Africa of their intent to acquire all of Modern Africa's equity interest in Warsun Nigeria, to Warsun Nigeria's Articles of Association and Nigerian law.

202.    Once Enterprise Defendants realized that Warsun's interest in Warsun Nigeria was subject to Plaintiffs' acquisition rights, and that Warsun Nigeria remained subject to the exclusive management and

28

control of Plaintiffs, Enterprise Defendants engaged in a multi-faceted effort to convert Plaintiffs' entire interest in Warsun Nigeria.

**A.      The Enterprise Defendants Delivered Notices via the Mail and Wires and Committed Other Predicate Acts Aimed at Defrauding Warsun Nigeria, its Customers and Plaintiffs**

203.    The ENTERPRISE devised a scheme for the purpose of defrauding or otherwise obtaining monies from the financial institution that maintained Warsun Nigeria's bank accounts.

204.    A representative of the ENTERPRISE, in September 2002, presented forged documents to Warsun Nigeria's bank, a multi-national financial institution, in an effort to obtain access to Warsun Nigeria's financial assets.

205.    This effort constituted a knowing attempt to defraud a financial institution and to otherwise obtain funds and assets under the custody of a financial institution by means of false or fraudulent pretenses and representations, in violation of Title 18, United States Code, Section 1344.

206.    Further, the ENTERPRISE devised and implemented a scheme to intercept funds payable to Warsun Nigeria through false and fraudulent representations, and transmitted writings, signs and signals via wire communications, in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343.

207.    Beginning in September 2002, Enterprise Defendants delivered written notices via U.S. and international mail systems to Warsun Nigeria's customers falsely representing that Warsun was entitled to receive Warsun Nigeria's incoming proceeds and directing that payments due to Warsun Nigeria be transferred by wire directly to the Company, then subject to the control of Enterprise Defendants, in violation of Title 18, United States Code, Section 1343.

208.    Subsequent notices were repeatedly sent by Enterprise Defendants via the mail systems and electronic wires, falsely explaining to Warsun Nigeria's customers the nature and cause of management

changes at the Company, soliciting the business of such customers, and requesting the diversion of funds due to Warsun Nigeria to the Company.

209.    In December 2003, Enterprise Defendants actually offered Warsun Nigeria for sale to third parties, via the mail systems and wire communication, falsely representing that they maintained rights to the business and assets of Warsun Nigeria.

210.    Enterprise Defendants have directly competed against Warsun Nigeria, notwithstanding their legal obligation to sell its business and shares to Plaintiffs.

211.    In the Spring of 2003, Enterprise Defendants falsely represented to customers, via wire communications, that an audit had found evidence of misappropriation of funds by Plaintiffs and evidence of mismanagement.

212.    Upon information and belief, Enterprise Defendants continue their representations to Warsun Nigeria's customers that they are entitled to receive payments from customers in Warsun Nigeria's stead.

213.    Enterprise Defendants continue to misappropriate and divert the goodwill and other assets of Warsun Nigeria and Plaintiffs through false pretenses and representations.

>    **B.**    **The Enterprise Defendants Have Engaged in Additional Attempts to Defraud Warsun Nigeria, Plaintiffs and Others In Connection with a Matter Before the United States Courts Pursuant to Title 11 of the United States Code**

214.    The Enterprise Defendants, in their capacity as managers of Warsun, a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code, devised a scheme to defraud Plaintiffs and others, and submitted misleading and fraudulent schedules to Warsun's bankruptcy petition in furtherance of such scheme.

215.    For instance, Enterprise Defendants attached a list of Warsun Nigeria's assets to a schedule submitted to the U.S. Bankruptcy Court, and represented that the assets were owned directly by Warsun.

216.    Enterprise Defendants falsely represented to the U.S. Bankruptcy Court that all of the shares of Warsun Nigeria, including the Nigerian telecommunications licenses it held, were assets of Warsun that would be acquired by Defendant Modern Africa pursuant to the terms of an asset purchase agreement.

217.    Warsun Nigeria's assets actually belonged to Warsun Nigeria, which was not the subject of any bankruptcy proceedings. Warsun maintained only an interest in shares of Warsun Nigeria, which shares were subject to Plaintiffs' right of acquisition.

218.    Enterprise Defendants falsely represented that Warsun had sold its telecommunications switch located in Reston, Virginia.

219.    Enterprise Defendants falsely represented that they maintained a controlling equity interest in Warsun along with a full secured interest as creditor.

220.    These acts were intended to enable the Enterprise Defendants to fraudulently acquire all of the assets of Warsun Nigeria.

   C.    **The Enterprise Defendants Have Undertaken Various Illegal Efforts to Convert Plaintiffs' Interest in Warsun Nigeria and to Take Possession of Warsun Nigeria's Assets and Facilities**

221.    Enterprise Defendants' efforts have included repeated, illegal efforts to take possession of Warsun Nigeria's facilities and assets by force.

222.    With respect to each occasion, representatives of the ENTERPRISE traveled in interstate and foreign commerce, and used the mails and other facilities in interstate and foreign commerce with the intent of promoting, managing and carrying on unlawful activities, and thereafter did attempt to promote, manage and carry on such unlawful activities.

223.    The unlawful activities engaged in by the ENTERPRISE involved attempted extortion and involved threatened, attempted and actual violence.

31

224.    On three consecutive days in September 2002 (September 9, 10 and 11), more than one dozen agents and representatives of the ENTERPRISE visited Warsun Nigeria's premises armed with automatic guns, crow bars, sledgehammers and torches.

225.    Upon information and belief, two agents of the ENTERPRISE traveled from the United States to Nigeria for the purpose of carrying out the aforementioned activities, and others used the mail and wire communications in interstate and foreign commerce in furtherance of the plan.

226.    In late January 2002, more than one dozen armed agents of the ENTERPRISE again visited Warsun Nigeria's premises.

227.    In September 2002, ENTERPRISE agents caused physical destruction to Warsun Nigeria's premises, sought illegal entry to the premises by force and attempted to physically harm Warsun Nigeria's manager when he appeared before them.

228.    The ENTERPRISE agents informed members of the Warsun Nigeria team that they intended to take physical possession of the assets and premises of Warsun Nigeria, and indicated that they would return to the premises under a similar threat to inflict violence until their demands were met.

229.    On numerous occasions, ENTERPRISE agents attempted to coerce Warsun Nigeria's manager, Chidi Ibisi, into assisting their efforts to defraud Plaintiffs.

230.    Plaintiffs, fearful for their lives, provided notice to the Enterprise Defendants of these activities on September 9, 2002, and, soon thereafter, secured a Nigerian federal court order restraining Warsun, under the exclusive control of Enterprise Defendants, from interfering with and damaging Warsun Nigeria's business and facilities.

231.    Plaintiff Abbey was present at Warsun Nigeria's premises during each of the violent raids described above, and hid himself to escape threatened physical violence.

32

232. After each raid, Enterprise Defendants' representatives were informed by Nigerian police of the illegality of their actions, and warned that their behavior, if continued, would likely spark violence and further physical confrontation.

233. After engaging in these activities, Enterprise Defendants subsequently caused Warsun to protest Plaintiff's acquisition of its shares in Warsun Nigeria and to dispute Warsun Nigeria's right to its own assets in Nigeria before separate courts in Nigeria. These disputes have not resulted in any substantive rulings in favor of Enterprise Defendants.

234. Enterprise Defendants efforts to seize Warsun Nigeria's assets and premises intensified following the purchase of Warsun's assets by Defendant Modern Africa on or around December 31, 2002, and the subsequent purchase of Warsun's assets by Defendant DiscoveryTel.

235. Upon information and belief, on or about January 27, 2003, at the behest of Enterprise Defendants, the Nigerian police summoned Chidi Ibisi to its headquarters for questioning.

236. Upon information and belief, Enterprise Defendants attempted to bribe the Nigerian police in connection with this matter so that Defendants could gain access to, and control over, Warsun Nigeria's assets.

237. On January 30, 2003, just two days after having received a warning from the Nigerian police regarding their conduct, agents of ENTERPRISE again stormed Warsun Nigeria's premises. They were rebuffed once again by the arrival of the police, who subsequently issued warrants for the agents' arrest.

238. On January 31, 2003, long after customary business hours, Enterprise Defendants' agents again stormed Warsun Nigeria's premises, this time successfully forcing entry. The agents, armed with machetes, sledgehammers, automatic guns and other weapons, beat Warsun Nigeria's guards, seized mobile phones, verbally and physically threatened Warsun Nigeria's employees, and forced them into a

33

small shed adjacent to Warsun Nigeria's offices, claiming they had been granted authority to kill members of the staff, and were awaiting final instruction.

239.    Agents of the ENTERPRISE severely beat several individuals and slashed at least one employee with a machete during the illegal raid on Warsun Nigeria's premises.

240.    The agents were subsequently jailed for their conduct.    Upon information and belief, ENTERPRISE agents, upon their arrival at Warsun Nigeria's premises and following their arrest, identified themselves as agents of Defendant Modern Africa, Defendant DiscoveryTel and Warsun.

241.    Upon information and belief, the representatives posted bail and immediately fled Nigeria in violation of their bail terms.

242.    Upon information and belief, agents of the ENTERPRISE, including Defendants Stephen Cashin and Niles Helmboldt, traveled from the United States to Nigeria in January 2003 in order to promote, manage and carry out the above-described activities, in violation of Title 18, United States Code, section 1952. Each of the raids was carried out in violation of Title 18, United States Code, Section 1951.

### D.    The Ongoing Nature of ENTERPRISE Predicate Acts

243.    Upon information and belief, ENTERPRISE agents and representatives continue to unlawfully suppress both the production of a police report describing the nature of their actions and offenses and legal proceedings that may be pursued against them in Nigeria.

244.    Enterprise Defendants continue ongoing, illegal efforts to evade prosecution in Nigeria and United State for the crimes they have committed.

245.    Despite (a) an initial request from Plaintiff Abrar, (b) several stern warnings from the Nigerian police, (c) a letter from Plaintiffs' counsel delivered to Defendants in late December 2002 and (d) the continuation of litigation in Nigeria, Enterprise Defendants repeated their violent raids on Warsun Nigeria's premises.

34

246.    But for the arrest of several ENTERPRISE agents, the Enterprise Defendants would have engaged in additional unlawful activities.

247.    Upon information and belief, Enterprise Defendants garnered police assistance to access and inspect Warsun Nigeria's files, thereby obtaining information on Warsun Nigeria's customers and business. The inspection was followed by the delivery, via wire interstate and international wire transfer, of false representations of Warsun's and DiscoveryTel's interest in Warsun Nigeria in an effort to fraudulently obtain money and property.

248.    Enterprise Defendants have clearly demonstrated no intention of abandoning their quest to obtain control over Warsun Nigeria through illegal acts.

### XV.    *Misconduct by the Enterprise Defendants Has Been the Proximate Cause of Damages to Plaintiffs and Warsun Nigeria*

249.    Irrespective of Plaintiffs' established legal rights, Enterprise Defendants intended to acquire the business and assets of Warsun Nigeria for their own benefit, exclusive of Plaintiffs' participation and ownership rights.

250.    Enterprise Defendant's actions have destroyed Warsun Nigeria's entire customer and revenue base, and caused Plaintiffs severe emotional distress, trauma, anguish and economic hardship.

251.    The multiple notices delivered by the Enterprise Defendants to Warsun Nigeria's customers caused customers to stop making payments, which led to a substantial loss of revenue and business opportunity for Warsun Nigeria. Enterprise Defendants misappropriated Warsun Nigeria's goodwill and other intangible assets, thereby converting Plaintiffs' interest in Warsun Nigeria.

252.    Warsun Nigeria presented a tremendous opportunity for Plaintiffs to build on Warsun Nigeria's early efforts, as well as a platform from which to continue their pursuit of a pan-African telecommunications enterprise apart from (and even in competition with) Warsun.

253.   Based upon the expertise of Plaintiffs and close relationship with Warsun's customer base, Plaintiffs' opportunity to control Warsun Nigeria immediately following the filing of the bankruptcy petition represented an opportunity for Plaintiffs to build a franchise rivaling Warsun's within a short period of time.

254.   This opportunity has been destroyed as a direct result of the Enterprise Defendant's continuing actions.

255.   The Enterprise Defendants' actions were deliberate, conspiratorial and malicious.

*XVI.*   ***Summary of Defendants' Misconduct***

256.   Defendant Modern Africa's intentional and deceitful conduct prior to and in connection with the bankruptcy filing and the aforementioned purchase of Warsun's assets, all aimed at ensuring that Plaintiffs' retained no interest in Warsun while Defendant Modern Africa continued Warsun's business, constituted a breach of its duty to Plaintiffs in their capacity as minority shareholders.

257.   Defendant Modern Africa, by exercising rights based upon its status as a creditor of Warsun to obtain full control over Warsun, despite the value of Warsun as a continuing entity, not only neglected its duties as controlling shareholder, but also converted Plaintiffs' equity interest in Warsun.

258.   The Enterprise Defendants, based upon the acts inflicted on Warsun Nigeria and its property and employees as described above, converted Plaintiffs' interest in Warsun Nigeria.

259.   The Enterprise Defendants conspired to and did engage in a deliberate scheme to undertake the unlawful activities described above that harmed Plaintiffs.

260.   But for the intervention of the Nigerian police (who, based upon information and belief, the Enterprise Defendants attempted to pay off) and the arrest of the ENTERPRISE agents, the Enterprise Defendants would have continued their pattern of illegal activities in Nigeria and through the use of the U.S. mail and wire communication in interstate and foreign commerce.   Nonetheless, upon information

36

and belief, the Enterprise Defendants continue their commission of certain racketeering activities as of the date of this Complaint.

**COUNT ONE**
**BREACH OF FIDUCIARY DUTY OWED**
**TO MINORITY SHAREHOLDERS**
**(Defendant Modern Africa)**

261.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

262.    Defendant Modern Africa, as the controlling and majority shareholder of Warsun, owed a fiduciary duty to Plaintiffs as minority shareholders of Warsun.

263.    Defendant Modern Africa breached this duty owed to Plaintiffs by withholding funds from Warsun, restricting Warsun's ability to obtain funding, causing the Company to file for bankruptcy under improper circumstances, and otherwise implementing a deliberate scheme to squeeze out and oppress Plaintiffs as minority shareholders.

264.    As a direct and proximate result of Defendant Modern Africa's breach of its fiduciary duty, Plaintiffs have incurred a loss of the entire value of their interest in Warsun, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)    Award Plaintiffs compensatory damages in excess of $10,000,000; and in addition

(b)    Award Plaintiffs punitive and exemplary damages in an amount in excess of $25,000,000; and in addition

(c)    Award Plaintiffs a reasonable attorney's fee and costs of this action including expert fees; and in addition

37

(d)   Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

## COUNT TWO
## CONVERSION OF PLAINTIFFS'
## INTEREST IN WARSUN
## (Defendants Modern Africa, Stephen Cashin and Niles Helmboldt)

265.   The allegations of the foregoing paragraphs are incorporated as if realleged herein.

266.   Defendant Modern Africa, in declaring a default on debts presumably due to it by Warsun, and by causing Warsun to file for bankruptcy, exercised its rights as a presumed creditor of Warsun notwithstanding the fiduciary duties it owed to Plaintiffs, and notwithstanding the fact that Modern Africa's interest in Warsun may be characterized as equity rather than debt.

267.   In so doing, Defendants intentionally and unlawfully exercised dominion, control and ownership over Plaintiffs' equity interest in Warsun.

268.   Defendants ignored and effectively repudiated the Plaintiffs' right to its equity stake in Warsun, without giving notice to Plaintiffs and an opportunity to cure.

269.   As a direct and proximate result of Defendant Modern Africa's conversion of Plaintiff's equity interest in Warsun, Plaintiffs have incurred a loss of the entire value of their interest in Warsun, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)   Award Plaintiffs compensatory damages in excess of $10,000,000; and in addition

(b)   Award Plaintiffs punitive and exemplary damages in an amount in excess of $25,000,000; and in addition

38

(c)     Award Plaintiffs a reasonable attorney's fee and costs of this action including expert fees; and in addition

(d)     Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

## COUNT THREE-
## AIDING AND ABETTING
### (Defendant DiscoveryTel)

270.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

271.    Defendant Modern Africa breached its fiduciary duty owed to Plaintiffs in at least the respect set forth in Paragraphs 316 to 319.

272.    Defendants Modern Africa, Stephen Cashin and Niles Helmboldt converted Plaintiffs' interest in Warsun in at least the respects set forth in Paragraphs 320 to 324.

273.    Defendant DiscoveryTel and its principals, by advising and assisting Defendants in their plan to cause Warsun to file for bankruptcy protection, and by acting and conspiring with Defendants to purchase the assets of Warsun to consummate the squeeze out of Plaintiffs as minority shareholders of Warsun, knowingly participated in and assisted Defendants in their breach of fiduciary duty to Plaintiffs.

274.    Based upon the foregoing, Defendant DiscoveryTel knowingly participated in and assisted Defendants in their conversion of Plaintiff' interest in Warsun.

275.    As a direct and proximate result of Defendant DiscoveryTel's actions, Plaintiffs have incurred a loss of the entire value of their interest in Warsun, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)     Award Plaintiffs compensatory damages in excess of $10,000,000; and

in addition

(b)     Award Plaintiffs punitive and exemplary damages in an amount in

excess of $25,000,000; and in addition

(c)     Award Plaintiffs a reasonable attorney's fee and costs of this action

including expert fees; and in addition

(d)     Award Plaintiffs such other and further relief as may be appropriate in

the circumstances.

## COUNT FOUR
## VIOLATION OF RACKETEER INFLUCENCED AND
## CORRUPT ORGNIZATION ACT (18 U.S.C. §§ 1962(c) and (d))
### (All Defendants)

276.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

277.    An association-in-fact existed involving Defendant Modern Africa, Defendant DiscoveryTel and

Defendants Stephen Cashin and Niles Helmboldt, along with others known and unknown.

278.    The common purpose of the Enterprise Defendants has been to manage and operate the business

of Warsun exclusive of Plaintiffs' participation and ownership rights, and to deprive or disgorge

Plaintiffs of and to convert Plaintiffs' entire interest in Warsun Nigeria.

279.    The Enterprise Defendants relied upon the mail and wires of the United States as an instrument

in furtherance of a scheme devised by them to defraud, and to obtain money and property by means of

false pretenses and representations, and in furtherance of the common purpose of the enterprise.

280.    The activities of the Enterprise Defendants constituted violations of various state and federal

criminal statutes that comprise racketeering activities, including statutes applicable to bank fraud, mail

40

and wire fraud, interstate and foreign travel or transportation in aid of racketeering enterprises, interference with commerce by threats or violence, offenses involving fraud connected with a case under title 11, threatened and attempted robbery and extortion and various other predicate activities.

281.    To the extent that Defendants are no longer engaged in or have otherwise ceased in committing predicate acts, their commission was interrupted only by the arrest of representatives of the Enterprise Defendants.

282.    As a direct and proximate result of Defendants' acts, Plaintiffs have incurred a loss of the entire value of their interest in Warsun Nigeria, a loss of business opportunities, damage to their business reputation and goodwill, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief, including the following claims for INJUNCTIVE RELIEF, as permitted pursuant to 18 U.S.C. §1964(a):

(a)    Award Plaintiffs compensatory damages in excess of $10,000,000; and in addition

(b)    Award Plaintiffs punitive and exemplary damages in an amount in excess of $25,000,000; and in addition

(c)    Require the Enterprise Defendants to disgorge any profits earned in connection with their operation and management of any enterprise engaged in the activities described herein; and in addition

(d)    Require the Enterprise Defendants to divest of any interest in any enterprise or entity engaged in any activities described herein; and in addition

41

(e)     Award Plaintiffs a reasonable attorney's fee and costs of this action

including expert fees; and in addition Award Plaintiffs such other and

further relief as may be appropriate in the circumstances.

### COUNT FIVE
### CONVERSION OF PLAINTIFFS'
### INTEREST IN WARSUN NIGERIA
### (All Defendants)

283.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

284.    The Enterprise Defendants, by interfering with Warsun Nigeria's customers and business, by

directing Warsun Nigeria's accounts receivable to it, by repeatedly raiding its premises and intimidating

its employees, by asserting ownership over Warsun Nigeria's assets, and by seeking to sell and/or

compete against Warsun Nigeria, effectively exercised intentional and unlawful dominion, control and

ownership over Plaintiffs' interest in Warsun Nigeria, including its prospective interest in the shares of

Warsun Nigeria owned by Warsun.

285.    The Enterprise Defendants effectively repudiated Plaintiffs' right to their Warsun Nigeria shares.

286.    As a direct and proximate result of Defendant's conversion of Plaintiff's equity interest in

Warsun Nigeria, Plaintiffs have incurred a loss of the entire value of their interest in Warsun Nigeria, a

loss of business opportunities, and other injuries, including, but not limited to, embarrassment,

humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)     Award Plaintiffs compensatory damages in excess of $10,000,000; and

in addition

(b)     Award Plaintiffs punitive and exemplary damages in an amount in

excess of $25,000,000; and in addition

42

(c)     Award Plaintiffs a reasonable attorney's fee and costs of this action

including expert fees; and in addition

(d)     Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

**COUNT SIX**
**INTERFERENCE WITH PLAINTIFFS'**
**PROSPECTIVE ECONOMIC ADVANTAGE**
**(All Defendants)**

287.   The allegations of the foregoing paragraphs are incorporated as if realleged herein.

288.   The Enterprise Defendants, by interfering with Warsun Nigeria's customers and business, directing Warsun Nigeria's accounts receivable to it, repeatedly raiding its premises and intimidating its employees, asserting ownership over Warsun Nigeria's assets, and by seeking to sell and/or compete against Warsun Nigeria, engaged in intentional, improper and unfair means of diverting business from Plaintiffs.

289.   The Enterprise Defendants were aware of and reasonably anticipated business opportunities that would accrue to Plaintiffs in their capacity as officers, directors and controlling shareholders of Warsun Nigeria.

290.   As a direct and proximate result of Defendant Modern Africa's interference with Plaintiff's prospective economic advantage, Plaintiffs have incurred a loss of the entire value of their interest in Warsun Nigeria, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)     Award Plaintiffs compensatory damages in excess of $10,000,000; and

in addition

43

(b)     Award Plaintiffs punitive and exemplary damages in an amount in excess of $25,000,000; and in addition

(c)     Award Plaintiffs a reasonable attorney's fee and costs of this action including expert fees; and in addition

(d)     Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

## COUNT SEVEN
## CONSPIRACY BY DEFENDANTS
### (All Defendants)

291.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

292.    Each of the Defendants knowingly agreed to participate in and collaborate on a deliberate scheme designed to squeeze out and oppress the minority shareholders of Warsun, convert Plaintiffs' interest in Warsun and Warsun Nigeria, and interfere with Warsun Nigeria's prospective business opportunities for their own economic advantage. In short, the common aim of the conspiracy was to deprive Plaintiffs' of their interests in Warsun and Warsun Nigeria.

293.    In pursuit of their common objective, Defendants commissioned, caused or otherwise engaged in numerous concerted acts, including a series of unlawful acts.

294.    As a direct and proximate result of Defendants' conspiratorial acts, Plaintiffs have incurred a loss of the entire value of their interest in Warsun and Warsun Nigeria, a loss of business opportunities, and other injuries, including, but not limited to, embarrassment, humiliation, stress and other emotional and psychological harm.

WHEREFORE, Plaintiffs demand the following relief:

(a)     Award Plaintiffs compensatory damages in excess of $10,000,000; and in addition

44

(b)     Award Plaintiffs punitive and exemplary damages in an amount in

        excess of $25,000,000; and in addition

(c)     Award Plaintiffs a reasonable attorney's fee and costs of this action

        including expert fees; and in addition

(f)     Award Plaintiffs such other and further relief as may be appropriate in the circumstances.

## JURY TRIAL

**PLAINTIFFS HASSAN ABBEY AND YUSSUR ABRAR DEMAND A TRIAL BY JURY.**

August 7, 2003                              Respectfully submitted,

                                            Donald M. Temple
                                            D.C. Bar No. 408749
                                            TEMPLE LAW P.C.
                                            1200 G Street, N.W., Suite 370
                                            Washington, D.C. 20005
                                            (202) 628-1101
                                            Facsimile: (202) 628-1149

45